JACKSON, Appellant,

v.

JACKSON, Appellee.

[Cite as *Jackson v. Jackson* (2000), 137 Ohio App.3d 782.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 18007.

Decided May 26, 2000.

784

*Ronald W. Ruppert* and *Jeffrey A. Ruppert,* for appellant.

*L. Patrick Mulligan,* for appellee.

BROGAN, Judge.

This case presents the unusual situation of a father contesting his duty to support children who were born during the parties' marriage by way of heterologous insemination (also known as "artificial insemination by donor," or AID). After hearing evidence, the trial court found that Brian Jackson had consented to the AID procedure and was responsible for supporting twin sons born on December 4, 1997. The trial court also made other rulings in the divorce case

that are at issue. In this regard, Mr. Jackson raises the following assignments of error:

"I. The trial court abused its discretion by failing to grant a new trial based upon newly discovered evidence.

"II. The trial court abused its discretion in finding plaintiff-appellant Brian Jackson to be the father of the two children born to defendant-appellee Connie Jackson.

"III. The trial court abused its discretion in incorrectly calculating the time from which the child support calculations were to commence.

"IV. The trial court abused its discretion in arbitrarily and unreasonably awarding the defendant-appellee one-half of the value of plaintiff-appellant's vehicle where the parties had previously agreed to a fair and equitable division."

Upon consideration of the assignments of error, we find the first, second, and fourth assignments of error without merit. However, the trial court did err in ordering support retroactive to birth. As a result, this case is affirmed in part and reversed in part, with instructions to the trial court to enter the correct amount of support. An explanation of our decision follows.

I

Because parentage is the major issue in this case, we will begin with the second assignment of error, which raises the trial court's abuse of discretion in finding Mr. Jackson the father of twin sons born during the marriage. To support this assignment of error, Mr. Jackson makes two claims. First, Jackson contends that he was improperly given the burden of proof on the consent issue. Next, Jackson says the trial court arbitrarily failed to address the testimony of several witnesses, including Mr. Jackson. According to Jackson, this failure means that the court's decision was against the manifest weight of the evidence.

As an initial point, we note that the burden of proof issue is one of first impression in this state. Under Ohio law, if a husband consents to AID, a conclusive presumption of paternity arises and cannot be rebutted. In this regard, R.C. 3111.03 states:

"(A) A man is presumed to be the natural father of a child under any of the following circumstances:

"(1) The man and the child's mother are or have been married to each other, and the child is born during the marriage * * *.

"(2) The man and the child's mother attempted, before the child's birth, to marry each other by a marriage that was solemnized in apparent compliance with the law * * *.

"(B)(1) * * * A presumption that arises under this section can only be rebutted by clear and convincing evidence that includes the results of genetic testing, except that a presumption that arises under division (A)(1) or (2) of this section is conclusive as provided in division (A) of section 3111.37 of the Revised Code and cannot be rebutted."

Similarly, R.C. 3111.37(A) provides:

"If a married woman is the subject of a non-spousal artificial insemination and if her husband consented to the artificial insemination, the husband shall be treated in law and regarded as the natural father of a child conceived as a result of the artificial insemination, and a child so conceived shall be treated in law and regarded as the natural child of the husband. A presumption that arises under division (A)(1) or (2) of section 3111.03 of the Revised Code is conclusive with respect to this father and child relationship, and no action or proceeding under sections 3111.01 to 3111.19 or section 3111.22 of the Revised Code shall affect the relationship."

R.C. 3111.03 places a burden of proof of "clear and convincing" evidence on a party contesting a paternity presumption. However, R.C. 3111.37 does not specify a particular burden of proof on the issue of consent to non-spousal donor insemination. Mr. Jackson's position is that the burden should be on the party seeking support, i.e., Mrs. Jackson, to prove consent by "clear and convincing" evidence. Mrs. Jackson does not argue for a specific standard. Instead, she simply says that the trial court did not give Mr. Jackson the burden of proof on the issue.

The burden of proof issue is somewhat clouded by the fact that Mr. Jackson, as the plaintiff, alleged in his complaint for divorce that two children (twins) were born during the marriage but were not the issue of the marriage. Mr. Jackson then filed a motion for DNA testing, claiming in an affidavit that he believed that his wife had committed adultery. Under normal circumstances, this attempt to rebut the presumption of paternity would have required Jackson to prove his claim by clear and convincing evidence. See, e.g., *Hulett v. Hulett* (1989), 45 Ohio St.3d 288, 544 N.E.2d 257.

Mrs. Jackson then filed an answer and counterclaim for divorce, stating that the twins were born as issue of the marriage. Again, this would raise the rebuttable presumption of paternity and Mr. Jackson would have the burden to prove otherwise. At trial, however, there appears to have been no dispute that the twins were fathered through AID, not as the result of adultery. Consequently, the only real issue for the trial court was whether Mr. Jackson consented to the AID procedure.

The trial court's decision did not explicitly use any particular burden of proof. Rather, the court began its analysis by discussing the testimony. Then, based on the facts as found, the court concluded that Mr. Jackson affirmatively consented to and actively participated in AID procedures, and did not communicate withdrawal of consent until after his wife was already pregnant. Accordingly, the court held that Mr. Jackson was obligated to support the children.

Before reaching a conclusion on consent, the court referred to some out-of-state cases that had held that implied consent is sufficient. The court also noted that one case required the husband to establish by clear and convincing evidence that prior consent had been revoked. However, the court did not specifically say it intended to apply that burden of proof.

The trial court's decision appears to be based on a belief that written consent was not required for consent to be effective. In this regard, the trial court first noted that the normal statutory presumption of paternity had been rebutted by evidence, including genetic testing, which showed that Brian Jackson had not fathered the children. The court then found that Mr. Jackson's consent to the procedure required application of the conclusive presumption of paternity in R.C. 3111.37.

According to the testimony, Brian Jackson was the father of two children from a previous marriage and had undergone a vasectomy in 1980. Before Brian married the current Mrs. Jackson (Connie) in 1991, they talked about having children. Brian and Connie both testified that Brian had agreed during these discussions to have more children.

After they were married, Brian and Connie consulted urologists to see if the vasectomy could be reversed. However, because the success rate for reversal was low, they both decided that it was not a viable option. They then investigated and decided to use AID. Brian indicated in his testimony that he did consent to AID in 1993. At that time, he went with his wife for instruction at the office of Dr. Daneshjoo (a doctor of obstetrics and fertility). Brian and Connie also went to an andrology lab to select donor sperm. And finally, Brian gave his wife fertility shots in the hip in September and October 1993, when AID was attempted. Neither attempt was successful.

Dr. Daneshjoo testified and was positive that he would have gotten Brian's written consent in 1993, as that was his normal procedure. However, no written consent form was ever found in the file. Nonetheless, there was no dispute about the fact that Brian consented in 1993. No further AID attempts were made until March 1997. Dr. Daneshjoo did not get a signed consent form in 1997 because consent had already been given.

Brian's account was that he and Connie had disagreements between 1993 and 1996 about having children. In particular, he focused on a conversation they had at a restaurant in either 1995 or 1996. During this conversation, he told Connie that he did not want children. He was concerned about his age and ability to effectively parent as he got older. In other conversations, he told Connie that he was concerned about the expense of having children. Connie's position was that she had to have children to fulfill her life.

In contrast, Connie testified that she was unaware that Brian did not want children. Brian also did not say he did not want her to try AID again. She did admit to having conversations with Brian about finances and his age. Specifically, they had built a new house in 1995 and she had a 1996 Monte Carlo car. Brian told her he was worried about finances if she became pregnant. In particular, he mentioned that they would have to sell the house and the car. Brian had concerns about his age (forty-eight at the time of the divorce hearing), all along, even when they were dating.

Both Brian and Connie agreed that in December 1996, Connie said she intended to try AID again at her yearly checkup, in March 1997. At that time, Brian said, "Do what you have to do and I'll do what I have to do." He did not elaborate further. Brian interpreted this remark to mean that he would leave. However, Connie interpreted it to mean that Brian would have to sell the car and house. In any event, Brian did not leave. Instead, they continued living together and acted as husband and wife, including being sexually active. Moreover, at no time before or during the AID process did Brian call Dr. Daneshjoo's office to withdraw his consent, nor did he tell anyone in the office that he did not consent to the procedure.

In March 1997, Connie again underwent AID. Brian was aware of this attempt. Connie asked Brian to go to the andrology lab with her, but he said he would rather go to work. At that time, Connie picked out donor sperm based on the characteristics listed on the 1993 form. These characteristics were intended to match Brian's eye and hair color, weight, and height. The lab already had the previous form, so all Connie did was copy information from one form to the other.

On the day the sperm was to be drawn, the lab called to say the donor sperm in stock had slightly different weight and height characteristics, but the eye and hair color were the same. Both Connie and Brian agreed that he knew about the substitution. They also both testified that when Brian was told about the planned substitution, his response was that it did not matter, as long as the baby was healthy.

The fertility shots this time were of a type that could be self-administered. Connie testified that Brian gave her the first shot because she was nervous, but Brian denied giving her any shots. In any event, the procedure was successful

this time. In April 1997, Connie went to Dr. Daneshjoo's office to see if she was pregnant. Brian knew she was going to the office for that reason and went with her. When Brian learned Connie was pregnant, he told her he was happy for her. (Brian said at trial that he also said he was not happy for himself, but this was contradicted by his deposition testimony.)

After Connie became pregnant, Brian and Connie continued to live together and were sexually active. However, when Brian learned that Connie was having twins, he told her that he was leaving. This was several months into the pregnancy. Brian moved out in September 1997, and the twins were born in December 1997.

Connie testified that Brian never told her that he would leave if she became pregnant. When she underwent AID, she was counting on her husband for emotional and financial support. She did not plan to have children without a father, did not want to be a single mother, and would not have had children if she knew that her husband would leave her.

Based on these facts, the trial court found, as we said, that Brian consented to the AID procedure and never communicated withdrawal of consent until after his wife became pregnant. We agree with the trial court's conclusions.

As we mentioned above, this is a case of first impression. Prior Ohio cases on AID are sparse and are not relevant to the issue before us. For example, in *Brooks v. Fair* (1988), 40 Ohio App.3d 202, 532 N.E.2d 208, the parties used AID to give birth to a daughter in 1975. At that time, the husband signed the birth certificate as natural father and held himself out as father in all respects. Later, in a 1981 divorce action, the parties acknowledged that the daughter was the issue of the marriage and the father was given visitation rights. He was also ordered to pay child support. Although the father complied with all duties and exercised his rights as a father for several years, the mother decided to refuse visitation. In order to cut off his rights, she filed a complaint in juvenile court, alleging that he was not the child's biological father. However, the juvenile court dismissed her complaint and the Third Appellate District then affirmed. In particular, the Third District found that public policy required the husband to remain the father of the child. *Id.* at 207, 532 N.E.2d at 212–213. Although the appellate opinion was issued in 1988, the court did not discuss the donor insemination statutes, probably because they were not enacted until 1986, eleven years after the child was born.

Subsequently, in *Kerns v. Schmidt* (1994), 94 Ohio App.3d 601, 641 N.E.2d 280, the Tenth District discussed Ohio's AID statutes in the course of deciding if a private right of action could be maintained against a physician who either negligently or fraudulently failed to obtain a husband's written consent to non-spousal artificial insemination. *Id.* at 610–613, 641 N.E.2d at 285–288. Ulti-

mately, the court allowed a private right of action. As in the present case, the husband in *Kerns* claimed that he did not consent to the procedure. *Id.* at 603, 641 N.E.2d at 281. However, the burden of proof on consent as it related to parentage was not considered, since that was not the issue before the court. Specifically, parentage had already been determined by procedural default, in a divorce action between the husband and wife. *Id.* at 604, 641 N.E.2d at 281–282. See, also, *Kerns v. Kerns* (1993), 87 Ohio App.3d 698, 622 N.E.2d 1149 (affirming denial of husband's Civ. R. 60[B] motion in the divorce action).

In the absence of interpretation by other Ohio courts, we are left with the terms of the statute itself. As we mentioned earlier, R.C. 3111.37(A) says that a conclusive presumption of paternity exists (1) if a wife is the subject of non-spousal donor insemination and (2) her husband consents to the procedure. Notably, this statute does not mention *written* consent as a prerequisite for the presumption. In this regard, R.C. 3111.37 differs from statutes in many other states, which directly connect the paternity presumption to written consent. For example, Cal.Fam.Code Ann. 7613(a) states:

"If, under the supervision of a licensed physician and surgeon and with the consent of her husband, a wife is inseminated artificially with semen donated by a man not her husband, the husband is treated in law as if he were the natural father of the child thereby conceived. The husband's consent must be in writing and signed by him and his wife." See, also, *e.g.*, Ill.Ann.Stat. 40/3, Chapter 750; N.M.Stat.Ann. 40–11–6; N.Y.DRL 73; Wis.Stat.Ann. 891.40; and Tex. Fam.Code Ann. 12.03. Therefore, we agree with the trial court's apparent conclusion that written consent was not a mandatory requirement for the paternity presumption in R.C. 3111.37 to arise.

We do note that some sections in the Ohio AID Act (R.C. 3111.30 through 3111.38) refer to written consent. For example, R.C. 3111.34 states:

"The non-spousal artificial insemination of a married woman may occur only if both she and her husband sign a written consent to the artificial insemination as described in section 3111.35 of the Revised Code."

R.C. 3111.35 outlines requirements for the consent form and imposes an obligation on physicians to obtain the written consent. Additionally, R.C. 3111.38 states:

"The failure of a physician or person under the supervision and control of a physician to comply with the applicable requirements of sections 3111.30 to 3111.37 of the Revised Code shall not affect the legal status, rights, or obligations of a child conceived as a result of a non-spousal artificial insemination, a recipient, a husband who consented to the non-spousal artificial insemination of his wife, or the donor. If a recipient who is married and her husband make a good faith

effort to execute a written consent that is in compliance with section 3111.35 of the Revised Code relative to a non-spousal artificial insemination, the failure of the written consent to so comply shall not affect the paternity consequences set forth in division (A) of section 3111.37 of the Revised Code."

What these statutes mean to the present case is that Dr. Daneshjoo should have obtained written consent before proceeding with the insemination. Technically, the Ohio AID law was violated if the doctor performed the procedure without written consent. However, even if Dr. Daneshjoo failed to obtain written consent, that fact would not affect the legal rights of the children, nor would it affect the legal rights or obligations of Brian Jackson.

Under R.C. 3111.38, the conclusive paternity presumption is not affected if a recipient and her husband make a good faith effort to execute an appropriate written consent. This part of the statute is obviously intended to provide protection from a donor's attempts to assert paternity, in situations where a technical defect exists in the written consent form or process. By implication, under R.C. 3111.38, the conclusive paternity presumption in R.C. 3111.37(A) is affected if parties do not make a good faith effort to execute a written consent that is appropriate. However, the statute is silent about situations where the parties orally consent but make no effort at all to execute written consent.

In this regard, we note that both Dr. Daneshjoo and his nurse said that the office's routine practice in every case was to require written consent. However, no written consent form was in the file. Dr. Daneshjoo had no independent recollection of this case but simply testified about his office notes and normal practices. The nurse had some independent recollection, but not of facts pertinent to this issue. Brian Jackson admitted that he consented to the first two AID attempts but denied signing anything in writing. And finally, Connie Jackson's testimony was silent on the issue of a written consent form. As we said, the trial court appears to have decided that the conclusive paternity presumption could arise in the absence of written consent and that implied consent was enough.

Based on a quite similar statutory scheme, an appellate court in Kansas held that AID was only allowed at the request and with the consent in writing of the husband and wife. By the same token, the court found nothing in the Kansas statutes expressing "a legislative intent that a husband who orally consents to heterologous insemination cannot be held [liable] on an equitable estoppel or implied contract theory." *R.S. v. R.S.* (1983), 9 Kan.App.2d 39, 44, 670 P.2d 923, 927–928. Accordingly, the court held:

"[W]hen a husband consents to heterologous insemination of his wife, that consent is presumed to continue through the time the wife becomes pregnant unless the husband establishes by clear and convincing evidence that such

consent had been withdrawn; and a husband who with his wife orally consents to the treating physician that his wife be heterologously inseminated for the purpose of producing a child of their own is estopped to deny that he is the father of the child, and he has impliedly agreed to support the child and act as its father." *Id.* at 44, 670 P.2d at 928,

The facts in *R.S.* are also quite similar to those of the present case. Specifically, in *R.S.*, the doctor did not obtain written consent, but the husband orally consented to the initial procedure, which was unsuccessful. A later attempt succeeded, and a child was born. The husband did not have any contract with the treating doctor immediately before the successful treatment. However, he also knew about the treatments and did not object. In a subsequent divorce action, the husband claimed that he was not responsible for support because he had withdrawn consent. As might be expected, the testimony on this point was conflicting. *Id.* at 40, 670 P.2d at 925. Based on the above facts, both the trial and appellate courts agreed that the husband never revoked consent and was, therefore, responsible for supporting the child.

Given the gaps in Ohio's statutory scheme, we believe the position taken in *R.S.* is sensible, with one exception as to the burden of proof. First, we note that while some parts of the Ohio AID Act stress written consent, the legislature did not directly condition the conclusive paternity presumption in R.C. 3111.37 on written consent. By contrast, statutes in other states that link written consent to the presumption are virtually identical and follow the format of Section 5 of the Uniform Parentage Act. See, *e.g., Alexandria S. v. Pacific Fertility Med. Ctr., Inc.* (1997), 55 Cal.App.4th 110, 124, 64 Cal.Rptr.2d 23, 32. Ohio could have used the same language as these other states but chose not to do so. Furthermore, even though R.C. 3111.34 says that AID may occur only if both parties sign a written consent, we read that prohibition as applying to the act of insemination itself, not to the presumption of paternity. As the trial court in R.S. noted, " '[t]he fact that the doctor in this case performed an act in a manner not authorized by statute will not affect the legitimacy of the child.' " 9 Kan.App.2d at 40–41, 670 P.2d at 925.

Under Ohio common law, children born during marriage were presumed to be issue of the marriage, but the presumption could be rebutted by clear and convincing evidence. *State ex rel. Walker v. Clark* (1944), 144 Ohio St. 305, 29 O.O. 450, 58 N.E.2d 773. We see no reason why a party who admits initial consent should not bear the burden of proving that consent has been withdrawn. We also see no reason not to apply doctrines like estoppel, implied consent, or implied contract.

Specifically, even where statutes explicitly condition the paternity presumption on the husband's written consent, courts have used such theories to uphold the

father-child relationship. As we mentioned earlier, New York, like California, links written consent to the irrebuttable paternity presumption. In *Anonymous v. Anonymous* (Jan. 18, 1991), Sup. Ct. N.Y. Cty., unreported, 1991 WL 57753, a trial court found that the New York statute required formal written consent before the paternity presumption would be irrebuttable. *Id.* at *4. However, the court also found that the statute did not deal with various other situations, such as (1) oral consent, (2) written consent given after insemination, (3) written consent which is not certified by the doctor, and (4) insemination that is not performed by a doctor. *Id.* Because the statute did not address these matters, the court decided to apply existing common law. The effect was that a child born within the marriage would be presumed the husband's child, but the presumption could be rebutted. *Id.* The court went on to stress that the husband's ability to rebut the presumption would be limited by concepts like equitable estoppel. *Id.* In effect, this is the same kind of analysis we have used, *i.e.,* by requiring the husband to prove withdrawal of consent.

In the context of the particular case, the New York court rejected equitable estoppel because the wife did not rely on any representations of her husband before she became pregnant. *Id.* at *7. However, the court eventually found the husband responsible for support because he had contracted to support the child after learning about the pregnancy. *Id.* at *13–*18.

Similarly, a New Mexico appellate court concluded that New Mexico's AID statute required a writing in order for the husband to be treated as the natural father. *Lane v. Lane* (App.1996), 121 N.M. 414, 418, 912 P.2d 290, 294. Nonetheless, the court applied a "substantial compliance" doctrine, under which "a court should determine whether the statute has been followed sufficiently so as to carry out the intent for which the statute was adopted and accomplishes the reasonable objectives of the statute." *Id.* at 419, 912 P.2d at 295. After applying the doctrine, the court found that the husband should be treated as the father of the child.

Wisconsin also has a statute linking written consent with the irrebuttable presumption. However, a Wisconsin appellate court has rejected a construction of the statute that would prevent the husband's paternity from existing without written consent. *S.C. v. R.C.* (Aug. 28, 1991), Waukesha App. No. 90–2299, unreported, at *2, 1991 WL 198136.

Likewise, Illinois has not absolutely barred a finding of paternity where written consent is absent. In this regard, the Illinois Supreme Court noted that the statutory provision for the husband's consent to be in writing "could be considered a mandatory requirement for establishing a parent-child relationship under the statute." *In re Marriage of Adams* (1990), 133 Ill.2d 437, 444, 141 Ill.Dec. 448, 451, 551 N.E.2d 635, 638. However, the court did not decide the issue,

because it felt the case should be governed by Florida law. Significantly, the court said, about both the Florida and Illinois AID laws, that "it is not clear whether under either statute the failure to provide written consent will preclude both the establishment of a parent-child relationship and the imposition of a support obligation. *It may be the case that a support obligation will be found even in the absence of a parent-child relationship.*" (Emphasis added.) *Id.* In a later decision, a lower Illinois court refrained from deciding that failure to obtain written consent would be an absolute bar to the father-child relationship where the father's conduct otherwise showed consent. *In re Marriage of Witbeck–Wildhagen* (1996), 281 Ill.App.3d 502, 505–506, 217 Ill.Dec. 329, 332, 667 N.E.2d 122, 125. In particular, the court focused on the lack of proof in the case of either oral or written consent. *Id.*

And finally, in Texas, written consent is required to establish a father-child relationship, but "ratification" has been used to validate the relationship and impose support obligations. *K.B. v. N.B.* (Tex.App.1991), 811 S.W.2d 634, 638.

Various theories have also been applied in states without AID statutes or in cases issued before a particular state statute was enacted. See *Levin v. Levin* (Ind.1994), 645 N.E.2d 601 (no statute; equitable estoppel); *In re Baby Doe* (1987), 291 S.C. 389, 353 S.E.2d 877 (no statute; express or implied consent sufficient); *K.S. v. G.S.* (1981), 182 N.J.Super. 102, 108, 440 A.2d 64, 68 (pre-statute; based on public policy considerations, consent is presumed unless husband proves otherwise by clear and convincing evidence); and *Gursky v. Gursky* (1963), 39 Misc.2d 1083, 242 N.Y.S.2d 406 (pre-statute; implied contract).

In one of the leading pre-statute or common-law cases, the California Supreme Court stated:

"[A] reasonable man who, because of his inability to procreate, actively participates and consents to his wife's artificial insemination in the hope that a child will be produced whom they will treat as their own, knows that such behavior carries with it the legal responsibilities of fatherhood * * *. One who consents to the production of a child cannot create a temporary relation to be assumed and disclaimed at will, but the arrangement must be of such character as to impose an obligation of supporting those for whose existence he is directly responsible." *People v. Sorensen* (1968), 68 Cal.2d 280, 285, 66 Cal.Rptr. 7, 11, 437 P.2d 495, 499.

Based on the preceding discussion, we believe that the trial court correctly found that Brian Jackson could be held responsible for support obligations in the absence of written consent. However, we also believe that Mrs. Jackson bore the burden of proving consent by a preponderance of the evidence. Once consent was established, Mr. Jackson then had to prove by a preponderance of the evidence that his consent was withdrawn. While this is something short of the

"clear and convincing" burden applied in the Kansas case, we feel it is appropriate. Specifically, if all the transactions relating to consent are oral, all parties should logically bear the same burden of proof.

Furthermore, our approach is consistent with the general burden of proof in paternity cases. See R.C. 3111.08 (actions brought to establish existence of father and child relationship are civil actions and are governed by the Rules of Civil Procedure); and *Domigan v. Gillette* (1984), 17 Ohio App.3d 228, 17 OBR 494, 479 N.E.2d 291 (in paternity proceeding under R.C. Chapter 3111, mother must prove her case by preponderance of the evidence). Accordingly, we find the first issue without merit, as Mr. Jackson was not given an improper burden of proof.

In this case, Mrs. Jackson met her burden by establishing that consent was given. Specifically, Mr. Jackson admitted that he initially consented to the procedure. As a result, Mr. Jackson then had to prove by a preponderance of the evidence that he withdrew consent. Our review of the facts indicates that Mr. Jackson failed to meet his burden. In this regard, we place particular reliance on Mr. Jackson's admitted comment, two days before the insemination, that the changes in the sperm donor profile did not matter "as long as the baby was healthy." This is certainly not a comment one would expect from a party who opposed the procedure.

█ As we mentioned earlier, Mr. Jackson's second claim is that the trial court's decision was against the manifest weight of the evidence. In this regard, Mr. Jackson contends that the trial court improperly disregarded his testimony and his witnesses. Specifically, Mr. Jackson relies on the testimony of two coworkers, Colin and Lori Skidmore, who allegedly testified as to Connie Jackson's knowledge that her husband did not want to proceed with AID.

█ When we consider manifest weight arguments, we "review the evidence, and * * * determine whether, when appropriate deference is given to the factual conclusion of the trial court, the evidence persuades us by the requisite burden of proof." *Howard v. Howard* (Mar. 20, 1998), Montgomery App. No. 16542, unreported, at 1, 1998 WL 127526, citing *State v. Thompkins* (1997), 78 Ohio St.3d 380, 678 N.E.2d 541. We have reviewed the entire transcript, and still agree with the trial court's conclusions. As we mentioned above, the evidence was conflicting. In addition to the facts already noted, Colin Skidmore testified that Connie told him that her husband was not in favor of the pregnancy. However, he could not remember if this conversation took place before or after Connie became pregnant. Therefore, even if the trial court believed Mr. Skidmore, his testimony adds nothing.

With respect to Mrs. Skidmore, the testimony indicated that she and Connie did not talk after August or September 1996, because they no longer worked together. According to Mrs. Skidmore, Connie never made a specific statement that her husband did not want children. She did testify that Connie made a statement at some point before August or September 1996, that having children was something she had to do, with or without her husband's approval. Connie explicitly denied making this statement to Mrs. Skidmore. As we have often said, the trial court is in a better position than we are to assess the credibility and demeanor of witnesses. See, e.g., *Walker v. Holland* (1997), 117 Ohio App.3d 775, 791, 691 N.E.2d 719, 729–730, and *Staffco Constr., Inc. v. Creative Sunroom Designs, Inc.* (Oct. 15, 1999), Montgomery App. No. 17738, unreported, at 1, 1999 WL 819578.

Furthermore, Connie presented testimony that supported her side of the story. For example, one of Connie's witnesses, Dana Michaels, testified that she knew both Brian and Connie and also knew that Brian had consented in the past to AID. In late 1996, Connie again talked to Dana about AID. There was no indication in 1996 or 1997 from Brian or anyone else that Brian no longer consented. According to Dana, she had an opportunity to observe Connie's emotional state from December 1996 through April 1997 (or, in other words, before and after the insemination procedure). There was no change during this time. However, Michaels indicated that Connie's emotional state did change abruptly after the ultrasound. At that time, Connie was emotionally distraught because Brian had changed his mind about being a parent. This testimony is consistent with Mrs. Jackson's claims. It is also consistent with Mr. Jackson's testimony, *i.e*, he said that when he learned his wife was having twins, he told her he was leaving.

Michaels' account was supported by evidence from Dr. Daneshjoo's office nurse, who testified to an abrupt change in Connie's emotional state after her pregnancy. According to the nurse, Connie was ecstatic when she found out she was pregnant. On either the following visit or two visits later, Connie was very upset because her husband was having a difficult time with her pregnancy. The nurse described Connie as "surprised or shocked." At this point, the visits were a month apart, meaning that the change occurred one or two months after Connie learned of the pregnancy. In a later visit, Connie was very upset and told the nurse that her husband was leaving.

As we said, the trial court had a better chance to assess the credibility of these witnesses. Given the conflicting testimony and the undisputed evidence about Brian Jackson's knowledge of the AID attempt and participation in the process, we are persuaded that the trial court's decision is supported by the evidence. As we said earlier, we focus in particular on the undisputed evidence about Mr.

Jackson's knowledge of the substitution of donor sperm and his response to the substitution. We also find it telling that Mr. Jackson went with his wife to the doctor's office on the day the pregnancy was confirmed. Again, these actions are inconsistent with Mr. Jackson's claim that he withdrew consent.

In light of the preceding discussion, the second assignment of error is without merit and is overruled.

## II

In the first assignment of error, Mr. Jackson contends that the trial court abused its discretion in overruling a Civ.R. 59(A) motion for new trial. This motion was based on Mr. Jackson's "discovery" of a letter written by his wife. The letter is undated and is incomplete (only one page is attached to the motion). An affidavit attached to the motion indicates that Mr. Jackson received the letter before December 1996, and did not find the letter before trial. In the letter, Mrs. Jackson states, "At one time you had said OK about having a baby, even after the Richard thing, but what happen [*sic*] on your end? That was just 2 years ago."

The trial court overruled the motion, finding, among other things, that the letter was information that could have been presented at trial. Mr. Jackson contends on appeal that the court abused its discretion because the letter was discovered soon after trial and contains content material to the important issue of consent.

Under Civ.R. 59(A)(8), a new trial may be granted on grounds of "[n]ewly discovered evidence, material for the party applying, which with reasonable diligence he could not have discovered and produced at trial." Whether a new trial is granted on this basis is within the trial court's sound discretion. *Drake Ctr., Inc. v. Ohio Dept. of Human Serv.* (1998), 125 Ohio App.3d 678, 706, 709 N.E.2d 532, 550–551.

A party who seeks a new trial based on newly discovered evidence must show "that the evidence was discovered after trial, that it is material to the issues, that it is not merely cumulative or simply impeaches or contradicts former evidence, and that its introduction would probably change the result if a new trial were granted. * * * Further, the party must demonstrate that it could not have discovered, in the exercise of due diligence, the new evidence prior to trial." *Wozniak v. Wozniak* (1993), 90 Ohio App.3d 400, 410–411, 629 N.E.2d 500, 507

In *Wozniak,* the newly discovered items were tax returns that were allegedly stored in boxes in the office of the party's original trial counsel and were not located in time for trial. *Id.* at 411, 629 N.E.2d at 507. However, both the trial and appellate courts rejected the new trial request, based on the belief that the documents could have been found, with the exercise of reasonable diligence, in

over a year of trial preparation time. *Id.* By comparison, about fifteen months elapsed in the present case between the time the divorce was filed and the last trial date. We find it hard to believe that the note could not have been found during that time. Accordingly, the trial court did not abuse its discretion in overruling the motion for new trial.

Based on the preceding discussion, the first assignment of error is overruled.

## III

██ The third assignment of error raises the trial court's alleged abuse of discretion in calculating when child support obligations should begin. In this regard, the trial court set child support at $414 per month per child for two children, to begin December 4, 1997 (the date of birth). Mr. Jackson contends that the trial court did not have jurisdiction to award support for the time period before the divorce action was filed. Additionally, Jackson says the award was inequitable because he immediately became $7,416 in arrears without fault, despite the fact that he had been paying $600 in temporary support since April 1998.

██ Support orders are reviewed for abuse of discretion, meaning that the trial court's attitude was " 'unreasonable, arbitrary, or unconscionable.' " *Booth v. Booth* (1989), 44 Ohio St.3d 142, 144, 541 N.E.2d 1028, 1030. Decisions are unreasonable if they are unsupported by a sound reasoning process. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597, 600–601.

In this case, the parties separated in September 1997, and the divorce action was not filed until March 4, 1998. An order of temporary support was issued on April 1, 1998, and the final order of support was entered in the divorce decree, on August 13, 1999. As we indicated, the trial court made the final support order retroactive to the date of birth. In our opinion, this decision was not supported by sound reasoning.

As an initial point, we think the trial court erred in awarding support retroactive to a time before the divorce action was filed. In *Meyer v. Meyer* (1985), 17 Ohio St.3d 222, 17 OBR 455, 478 N.E.2d 806, the Ohio Supreme Court stressed that when parents live separate and apart, they stand on equal footing concerning the duty to support minor children of their marriage. *Id.* at 224, 17 OBR at 457, 478 N.E.2d at 808. In other words, the father does not have the primary support duty. In *Meyer,* the court also said that in the absence of a support order, the custodial parent must support the minor children. *Id.* The court further noted that ordering reimbursement for past support expenses would be "manifestly unfair" to the noncustodial parent. As a result, under the

facts of that case, the court refused to let a custodial parent be reimbursed for support by a noncustodial parent, where no support order was made or requested at the time custody was awarded.

Subsequently, the Ninth District followed the philosophy expressed in *Meyer* and rejected an attempt to collect child support for the six-month period between physical separation and the filing of a divorce action. *Trump v. Trump* (1999), 136 Ohio App.3d 123, 736 N.E.2d 39. Specifically, the Ninth District said that an order ruling on obligations before an action was commenced "would be a retrospective award of child support ancillary to a divorce proceeding, and, therefore, would be void." *Id.* at 127–128, 736 N.E.2d at 43. See, also, *Liggins v. Liggins* (Nov. 9, 1981), Ross App. No. 796, unreported, 1981 WL 6055 ("trial court lacks jurisdiction to retroactively apply an award of child support to a time prior to the court's acquisition of jurisdiction of the matter").

We agree with these cases and find that the trial court lacked jurisdiction to award support for the period preceding the filing of the divorce action. Accordingly, the court erred in awarding child support for the time between birth and the date of filing (4 months @ $414.00 per month per child, for a total of $3,312).

■ As a further matter, we agree with Mr. Jackson that the trial court could not retroactively modify the temporary support order and impose an arrearage. Under Civ.R. 75(N), trial courts may enter temporary support orders during the pendency of divorce actions. Rule 75 further provides that temporary support orders may be modified, upon written request, and after an oral hearing. The rule does not mention retroactivity.

At the time the temporary and permanent support orders were entered in this case, Loc.R. 4.21 of the Montgomery County Common Pleas Court, Domestic Relations Division, stated that objections could not be made to magistrate orders containing pre-decree support orders. Loc.R. 4.21 also said that "[t]he Court does, however, retain jurisdiction to make any modifications to the temporary order during the pendency of the divorce action or at the final hearing on the action as it believes equitable and within the sound discretion of the Court." Presumably, under the authority of this local rule, the trial court had jurisdiction to modify the temporary support order at the final hearing to allow additional support, if an increase appeared equitable.

However, under similar circumstances, we have criticized Montgomery County's local rule and have also rejected a modification of temporary support. See *Drumm v. Drumm* (Mar. 26, 1999), Montgomery App. Nos. 16631 and 17115, unreported, 1999 WL 198120. In *Drumm*, temporary spousal support of $687 per month was ordered, and the husband was allowed to discharge the obligation by paying the mortgage and utilities on the parties' home. Apparently, he did

neither. After the final hearing, the trial court awarded $3,200 per month in support and multiplied that amount by the number of months that had elapsed since the temporary support order was issued. The court then awarded judgment for this amount ($47,900) against the husband for the spousal support "arrearage." *Id.* at *6.

On appeal, we found that the prohibition of objections in Loc.R. 4.21 was inconsistent with Civ.R. 53(C)(3)(b), which specifically allows objections to any magistrate's order entered under Civ.R. 75(N). *Id.* We further noted that Loc. R. 4.21 appeared to be an impermissible attempt by the domestic relations court to create its own jurisdiction. *Id.* Moreover, while we agreed that courts have inherent power to vacate or modify their own orders during the pendency of an action, we also stressed that "the court cannot retroactively modify an obligation it imposed in a prior temporary order, and then award judgment to the obligee based on the obligor's failure to satisfy the modified obligation in the interim. To do so grants a remedy on a claim for relief on which the obligor had no notice or opportunity to be heard. It is well-established that prior notice and opportunity to be heard concerning the determination of any matter affecting a party's rights and obligations are essential elements of due process of law. * * * A person who is deprived of property without an opportunity to be heard is denied due process of law." *Id.* at *7.

Although the trial court in the present case technically did not award judgment in a specific amount against Mr. Jackson, the content of the final divorce decree had the same effect. Specifically, the court awarded an increase in child support, made the increase retroactive throughout the time of the prior temporary award, and ordered Mr. Jackson to bring any arrearage current "forthwith." Thus, as Jackson contends, the trial court's award caused an immediate arrearage of about $4,104 for the time the action was pending (18 months × $228). (This arrearage is in addition to the $3,312 we have already discussed for support between birth and the date the divorce was filed.)

In *Drumm*, we recognized that retroactive modification of a support award may be allowed where assets have been concealed or misrepresented. *Id.* However, in the absence of such circumstances, a subsequent modification retroactive to a previous temporary order violates due process. *Id.* See, also, *Osborne v. Osborne* (1992), 81 Ohio App.3d 666, 674, 611 N.E.2d 1003, 1008–1009 (retroactive modification of child support order is permitted only in extreme and limited circumstances, such as where fraud has been committed). No allegations of concealing assets or fraud were made in the present case, and the trial court had no permissible basis for retroactively modifying the temporary support order. Accordingly, the third assignment of error has merit and is sustained.

Based on the preceding discussion, the trial court's order retroactively modifying support is vacated, and this case is remanded to the trial court for entry of an order reflecting the correct amount of support due, *i.e.*, $414 per month per child, beginning with the date of the final divorce decree. Further, the trial court should also file an entry indicating the true state of any arrearage (or any amount Mr. Jackson has possibly overpaid due to the erroneous retroactive order). In this regard, we note that our calculations of the "arrearage" are somewhat different from the figures Mr. Jackson presented. For example, while Mr. Jackson argued in his brief that the temporary support obligation was $600 per month, it was actually $150 per week, which works out to a slightly different monthly amount. Moreover, we calculate that about seventeen months, not eighteen, elapsed between the time of the temporary support order and entry of the final divorce decree. On remand, the trial court, with the cooperation of the parties, can figure out what amounts are actually due.

## IV

In the final assignment of error, Mr. Jackson claims the trial court abused its discretion in awarding Mrs. Jackson one-half the equity in a 1993 Chevrolet pickup truck. According to Mr. Jackson, the parties had agreed to a fair division of personal property. Mr. Jackson's opinion of the fairness of this agreement was based on his belief that he would receive the pickup truck, which was then titled in his wife's name.

Under R.C. 3105.171, the trial court has authority to divide the marital property of the parties. By statute, the division is equal, unless the court decides such a division is inequitable. See R.C. 3105.171(C). In the present case, the court found no equitable reason not to make the division approximately equal. In the divorce decree, the trial court noted that the parties had equitably divided their tangible personal property and awarded each party the property currently in his or her possession. The court also ordered Mrs. Jackson to give Mr. Jackson a signed title to the 1993 pickup truck, contingent on Mr. Jackson's payment of one-half the NADA book value of the truck. Additionally, the court awarded Mrs. Jackson a 1994 GMC Jimmy truck, which had no net equity. This truck was also titled in Mrs. Jackson's name.

Trial courts have broad discretion in deciding appropriate property awards in divorce cases. See, *e.g., Berish v. Berish* (1982), 69 Ohio St.2d 318, 319, 23 O.O.3d 296, 297, 432 N.E.2d 183, 184. As a result, we will not reverse a property division unless the trial court abused its discretion. *Procuniar v. Procuniar* (1995), Greene App. No. 95 CA 19, unreported, at 2, 1995 WL 526409. After reviewing the testimony and the decision, we find no abuse of discretion.

According to Mr. Jackson, the parties had agreed on what property they wanted. For the division to be totally fair, Mr. Jackson felt that his wife should sign over the 1993 truck to him. Mr. Jackson had not researched the value of the truck, nor did he assign a value to it. At the time of separation, only a few payments on the truck remained, and any debt was paid off by the time of the divorce hearing. No testimony was given about the value of other assets that were divided.

Mrs. Jackson was not asked by either side whether she felt that the property division was fair, nor was she asked what the parties had agreed upon. She did testify that the Chevrolet pickup truck was purchased for about $14,000 or $16,000 in 1993. She also said that about the same amount was paid for the 1994 GMC Jimmy. However, she still owed about $13,000 on that truck. She did not give an opinion on the fair market value of either vehicle.

Notably, this was not a case involving significant assets. In fact, the debts of the parties exceeded their assets. The cars were the only items of particular value, other than two small retirement accounts. The trial court awarded each party his or her own retirement account, and equally divided the only asset with equity. While Mr. Jackson may have felt that the distribution was unequal, he did not give the court any specific information supporting his comment. In view of these facts, we do not find that the trial court's attitude was unreasonable, arbitrary, or unconscionable. Accordingly, the fourth assignment of error is without merit and is overruled.

Based on the preceding analysis, the first, second, and fourth assignments of error are overruled, and the third assignment of error is sustained. The judgment of the trial court is affirmed, except the part awarding child support retroactive to the date of birth. That portion of the judgment is vacated, and this case is remanded to the trial court for entry of an order reflecting the correct amount of support due, *i.e.*, $414 per month per child, beginning on the date of the final divorce decree. Further, the entry must reflect the true state of any arrearage (or any amount Mr. Jackson has possibly overpaid due to the erroneous retroactive order), taking into consideration the amounts of support paid since April 1998.

*Judgment accordingly.*

WOLFF and FAIN, JJ., concur.