Hugh BROWN *v.* Kathy BROWN

CA 03-403                                          125 S.W.3d 840

Court of Appeals of Arkansas
Division III
Opinion delivered October 22, 2003

*Killough Law Firm*, by: *Larry Killough, Jr.*, for appellant.

No response.

JOHN F. STROUD, JR., Chief Judge. Appellant, Hugh Brown, and appellee, Kathy Brown, were married in 1991. Two children, twins, were born in October 2000 by means of artificial insemination, using sperm from a donor bank in California. It is undisputed that the statutorily required written consent was not obtained from appellant prior to the artificial insemination. Appellee filed for divorce in 2002. Appellant sought to avoid child-support obligations, contending that the children were not his. The divorce decree was entered December 19, 2002. The trial court determined that while the written consent required by statute had not been obtained, appellant was "barred by the doctrine of estoppel from denying the children are his." The sole issue on appeal is whether the "trial court's finding that appellant should be legally declared the father of the minor children born during the marriage is contrary to the weight of the evidence and is clearly erroneous." We affirm.

In this one-brief case, appellant relies upon Arkansas Code Annotated section 9-10-201(a) (Repl. 2002), to support his position. It provides:

> (a) Any child born to a married woman by means of artificial insemination shall be deemed the legitimate natural child of the woman and the woman's husband *if the husband consents in writing to the artificial insemination.*

(Emphasis added.) In addition, Arkansas Code Annotated section 9-10-202(b) (Repl. 2002), provides:

> (b) Prior to conducting the artificial insemination, the supervising physician shall obtain from the woman and her husband or

the donor of the semen a written statement attesting to the agreement to the artificial insemination, and the physician shall certify their signatures and the date of the insemination.

It is undisputed that appellant did not consent in writing to the procedure, and he contends that, contrary to the trial court's application of the doctrine of estoppel, the lack of such consent should be dispositive of the issue. We disagree.

Here, appellant testified that during his marriage to appellee, she gave birth to twin girls, Megan Leigh Brown and McKenzie Lauren Brown. He stated that his name was on the birth certificates and that he was aware that the children were being given the last name of "Brown," with him being shown as the father on the birth certificates. He stated that he accompanied appellee to the doctor twice while she was pregnant and that those two visits were for ultrasounds. He said that he was concerned about the health of the children and that he was supporting appellee.

Appellant explained that appellee was artificially inseminated and that the sperm came from a donor bank in California. He said that he had a vasectomy performed prior to marrying appellee; that she first told him she wanted to have children about five years ago; that he told her "he guessed that she needed to find another husband"; that he had his vasectomy reversed about two years later, but not because he wanted children; and that the reversal was performed to relieve a chronic problem with epidymitis.

Appellant stated that he and appellee discussed the possibility of having a child at the time the reversal was performed, and that the doctor said the chances were about one in one thousand that they would be successful. He said that around the first of February 2000, he had sperm counts performed, one in Little Rock and one in Searcy, and that the tests indicated all of his sperm were dead. He testified that during all of that time he had no intention of appellee becoming pregnant.

Appellant explained that appellee subsequently contacted the California Cryobank and showed him papers from there that she wanted to discuss. He said that she told him she wanted to get some information from that facility; that since they were married, the facility would not release any information to her without his signature; that he confirmed with her that he was only signing to find out information because he was concerned about diseases and genetic problems; that she assured him his signature was only for

the purpose of getting information; and that at the time he signed the document, she told him it was only to pay for the information that the sperm bank was sending about the program and the donors. He said that she received the information and that she then told him she wanted to purchase a sample of semen.

Appellant testified that he was not told about the insemination procedure until it was over and that he first learned appellee was pregnant during the first week or two of April. He said that he told her he could not believe that she had undergone the procedure because she knew that he was against artificial insemination with donor sperm; that he was also against the procedure "based on Christian principles"; and that he did not like the fact that his wife was pregnant by another man. He also acknowledged, however, that he could not really say that his objections were based on the fact that he did not want another child; that he was there when the girls were born; that he and appellee agreed on names for the children; that they called appellee's family to inform them of the births; and that he expressed to her family how happy he was about the births.

Appellant stated that as long as there was a marriage partnership, he was willing to meet appellee halfway on any issues, including raising the girls, but that once appellee decided to divorce him, he wanted nothing to do with the girls and did not feel that he should be financially responsible for them.

Appellee, Kathy Brown, testified that she was aware appellant had undergone a vasectomy prior to the marriage, but that after the marriage, she decided she wanted to have children. She acknowledged that he told her that she would "need to get another husband." She stated that appellant later had his vasectomy reversed due to complications. She said that at that point they were both hopeful that they might have a child together, but that they later learned his sperm count was not sufficient. She explained that they started looking at the alternatives of adoption and artificial insemination. She said that they assumed because of their ages they might not be able to adopt and that she presented him with documents from the California Cryobank. She stated that she did not agree with appellant's testimony that her contact with Cryobank was for information only and that when she received the information regarding donors from Cryobank, appellant actually picked the donor from the information provided. She testified that she told him that she was going to order a semen specimen from

the donor that he had chosen and that they both signed a document shielding Cryobank from liability in connection with the sale of donor sperm. She denied forging appellant's signature on the document.

Appellee stated that appellant was in the delivery room when the girls were born; that he helped choose their names; and that he was listed as the father on the birth certificates, with his consent. She testified that she assumed appellant had consented to the artificial insemination procedure because he signed the papers and he never told her not to undergo the procedure. She also stated that he never asked her to have an abortion after she became pregnant and that he had supported the children since their birth, holding them out as his own.

Appellee stated that she took appellant's silence as an agreement that she could proceed. She testified that appellant knew on the day of the insemination that she was going to have the procedure performed; that she had gotten an ovulation kit and told him that she was ordering the sperm and going to the doctor the next day to have the procedure performed. She stated that she could not remember why appellant did not accompany her, but that she thought it was because he could not get away from his job. She testified that appellant was only religious when it suited his purposes and that if he denied picking the donor, he would not be telling the truth.

Appellee stated that she and appellant went to the Women's Clinic in January 2000 to discuss pregnancy; that she had already contacted the Cryobank at that time; and that they discussed with the doctor appellant's sperm count and artificial insemination using donor sperm. She said that she ordered the sperm on a Thursday and went to the Clinic on Friday for the procedure; that she told appellant what she planned to do the day before; and that he did not say much, but did not tell her she could not have the procedure done. She stated that she called appellant after the procedure was completed and told him she was going home. She explained that he never let her believe that it would be the end of their relationship if she had the procedure performed.

The trial court subsequently ruled that "despite the fact that the husband's consent was not obtained in writing . . . , he is estopped as a matter of law to deny that these children are his because of his conduct . . . ." The trial court then recounted the facts that supported its conclusion, clearly crediting appellee's

testimony over that of appellant: (1) that appellant knew appellee was going to get the sperm; (2) that appellant never said he would not consent to the procedure being performed and he signed the documents that were placed in front of him; (3) that appellant helped pick out the donor for the sperm; (4) that he allowed his name to be used on the birth certificate; (5) that after the children were born, he recognized them as his children; (6) that it was only after appellee began to talk about divorce that he decided he should not be responsible for the children.

■ The elements of equitable estoppel are these: (1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting estoppel has a right to believe the other party so intended; (3) the party asserting estoppel must be ignorant of the facts; (4) the party asserting estoppel must rely on the other's conduct to his detriment. *Office of Child Support Enforcement v. King*, 81 Ark. App. 190, 100 S.W.3d 95 (2003).

■ In accordance with the trial court's credibility determinations, (1) appellant knew the facts, *i.e.*, he knew that appellee was having the artificial-insemination procedure performed; (2) appellant acted as if he agreed to the procedure, accepted the children as his own, and showed every intention to support them, *i.e.*, leading appellee to believe that he so intended; (3) appellee was ignorant of the facts asserted by appellant at the hearing, *i.e.*, that he did not know she was having the procedure and did not plan to treat the children as his own; and (4) appellee relied to her detriment on appellant's conduct, *i.e.*, she proceeded with the artificial insemination, fully expecting appellant to support the children as his own. We find no error in the trial court's conclusion that appellant was estopped to deny that he is the father of these two children.

Affirmed.

NEAL and ROAF, JJ., agree.