[856 NYS2d 258]

# Laura WW., Respondent, v Peter WW., Appellant.

Third Department, April 11, 2008

**APPEARANCES OF COUNSEL**

*Andrew H. Van Buren*, Hobart, for appellant.

*Laura WW.*, Delhi, respondent pro se.

*Jehed Diamond, Law Guardian,* Delhi.

## OPINION OF THE COURT

SPAIN, J.

At issue is the novel question of whether a husband can be deemed the legal parent of a child born to his wife, where the child was conceived as a result of artificial insemination by donor (hereinafter AID)[1] during the marriage, but where the husband's consent to the AID was not obtained in writing.

The parties to this divorce action were married in 1995. After two children were born to the marriage, defendant (hereinafter the husband) had a vasectomy. In 2004, plaintiff (hereinafter the wife) became pregnant again, as a result of AID, with a third child (hereinafter the child). A few months into the wife's pregnancy, the parties separated pursuant to an agreement which provided, among other things, that the husband would not be financially responsible for the child. However, in her subsequent complaint for divorce, the wife alleged that the child was born to the marriage. The parties then entered a settlement agreement which reaffirmed the terms of the separation agreement and calculated the husband's support obligation based on two children. Thereafter, Supreme Court found that the provision in the separation agreement absolving the husband of his support obligation for the child was void as against public policy. Following a hearing on the issue of paternity, Supreme Court held that the husband was the child's legal father and modified the parties' stipulation by increasing the husband's child support obligation based upon three children, instead of two. Thereafter, the court entered judgment granting the divorce. The husband appeals and we now affirm.

■ Initially, we agree with Supreme Court that the provision of the settlement agreement absolving the husband of any support obligation with respect to the child is unenforceable. Despite the fact that the parties stipulated to the terms of the divorce, the court correctly recognized its obligation to protect the best interests of the child, and appointed a Law Guardian. Indeed, the agreement left the child fatherless without any hearing or analysis of the child's rights and interests. Given that "the needs of a child must take precedence over the terms

---

1. Artificial insemination is the process by which a woman's body is injected with semen in an effort to fertilize her own eggs. The process can utilize the semen of the woman's husband, known as AIH, or that of a third party, often anonymous, donor as occurred here (AID).

of the agreement when it appears that the best interests of the child are not being met," we agree that the parties' agreement—which preceded any determination of legal paternity—to leave the child without the husband's support cannot stand (*Matter of Gravlin v Ruppert*, 98 NY2d 1, 5 [2002]; *see Harriman v Harriman*, 227 AD2d 839, 841 [1996]).

■ Next, we turn to the application of Domestic Relations Law § 73 to the facts of this case. That section provides a mechanism for married couples who utilize AID to have a child with assurances that the child will be, for all purposes, considered the legitimate child of both the woman and her husband (*see* Domestic Relations Law § 73 [1]). Specifically, Domestic Relations Law § 73, which creates an irrebuttable presumption of paternity when certain conditions are met, states:

> "Any child born to a married woman by means of artificial insemination performed by persons duly authorized to practice medicine and with the consent in writing of the woman and her husband, shall be deemed the legitimate, natural child of the husband and his wife for all purposes. . . .

> "The aforesaid written consent shall be executed and acknowledged by both the husband and wife and the physician who performs the technique shall certify that he [or she] had rendered the service."

Given the clear and specific language making written consent a prerequisite to invoking the statute's protections, we cannot find that the statute applies where, as here, it is conceded that the husband did not consent in writing to the procedure. Indeed, the wife's physician testified that he rarely performed AID[2] and conceded that he did not have any office protocol or standard form for obtaining the consent of the woman's husband. Under these circumstances, we conclude that Domestic Relations Law § 73 does not establish the husband's relationship to the child.

■ The fact that paternity cannot be established by statute, however, does not end our inquiry (*cf. In re Parentage of M.J.*, 203 Ill 2d 526, 535-537, 787 NE2d 144, 149-150 [2003] [holding written consent to AID essential to finding paternity]). Neither the language nor legislative history of Domestic Relations Law

---

2. On its face, the statute appears to apply equally to AIH (artificial insemination utilizing the semen of the woman's husband) and AID, but—presumably—the irrebuttable presumption of paternity would not be necessary in the former case.

§ 73 suggests that it was intended to be the exclusive means to establish paternity of a child born through the AID procedure. Indeed, the statute, by its terms, covers one specific situation where it operates to create an irrebuttable presumption of paternity; it applies only where the parties are married, the procedure is performed by a person "duly authorized to practice medicine" and the consent is appropriately written, executed, acknowledged and certified (*see* Attorney General's Mem in Support, Bill Jacket, L 1974, ch 303, at 3 [noting statute does not address the legitimacy of children born without husband's written consent or those conceived by AID prior to the enactment of the statute]; *see also Matter of Thomas S. v Robin Y.*, 209 AD2d 298, 299 [1994], *lv dismissed* 86 NY2d 779 [1995] [insemination performed by the woman at home]).

Certainly, situations will arise where not all of these statutory conditions are present, yet equity and reason require a finding that an individual who participated in and consented to a procedure intentionally designed to bring a child into the world can be deemed the legal parent of the resulting child (*see* Letter from Div of Human Rights, Bill Jacket, L 1974, ch 303, at 9 [noting the statute does not provide a result where AID is performed by someone other than a " 'duly authorized' physician," but that status of the medical professional should not impact legitimacy of child]). Indeed, "if an unmarried man who biologically causes conception through sexual relations without the premeditated intent of birth is legally obligated to support a child, then the equivalent resulting birth of a child caused by the deliberate conduct of artificial insemination should receive the same treatment in the eyes of the law" (*In re Parentage of M.J.*, 203 Ill 2d at 541, 787 NE2d at 152; *see In re Baby Doe*, 291 SC 389, 392-393, 353 SE2d 877, 878-879 [Sup Ct 1987] ["even where husband's written consent is statutorily required, the failure to obtain written consent does not relieve (the) husband of the responsibilities of parentage"]; *see also R.S. v R.S.*, 9 Kan App 2d 39, 44, 670 P2d 923, 928 [1983]).

We thus reject the husband's attempt to invoke noncompliance with Domestic Relations Law § 73 as a bar to a finding that he is, legally, the child's father. It is clear that the overriding purpose of the statute is to give certainty to the legitimacy of those children conceived via AID whose parents complied with all of the statutory prerequisites, rather than to create a means of absolving individuals of any responsibility toward a child, even if the proof could otherwise establish that the indi-

vidual participated in and consented to the decision to create the child (*see* Attorney General's Mem in Support, Bill Jacket, L 1974, ch 303, at 3; Mem of Dept of Social Servs, Bill Jacket, L 1974, ch 303, at 7; Letter from Dept of Health, Bill Jacket, L 1974, ch 303, at 8; *see also In re Parentage of M.J.*, 203 Ill 2d at 534, 787 NE2d at 148).

Accordingly, as the statute is neither applicable to nor determinative of the issue of paternity presented, we turn to the common law for an answer. To begin, "New York has a strong policy in favor of legitimacy" (*Matter of Anonymous*, 74 Misc 2d 99, 104 [1973]). Indeed, the presumption that a child born to a marriage is the legitimate child of both parents " 'is one of the strongest and most persuasive known to the law' " (*State of New York ex rel. H. v P.*, 90 AD2d 434, 437 [1982], quoting *Matter of Findlay*, 253 NY 1, 7 [1930]). Hence, our analysis begins with the rebuttable presumption that the child, a child born to a married woman, is the legitimate child of both parties.

Prior to the enactment of Domestic Relations Law § 73, a Surrogate's Court held "that a child born of consensual AID during a valid marriage is a legitimate child entitled to the rights and privileges of a naturally conceived child of the same marriage" (*Matter of Anonymous*, 74 Misc 2d at 105). This common-law rule is shared by numerous jurisdictions which have held, even in the absence of statutorily required written consent, that "the best interests of children and society are served by recognizing that parental responsibility may be imposed based on conduct evincing actual consent to the artificial insemination procedure" (*In re Parentage of M.J.*, 203 Ill 2d at 540, 787 NE2d at 152; *see Brown v Brown*, 83 Ark App 217, 222, 125 SW3d 840, 843-844 [2003]; *Lane v Lane*, 121 NM 414, 419-420, 912 P2d 290, 295-296 [Ct App 1996], *cert denied* 121 NM 375, 911 P2d 883 [1996]; *In re Baby Doe*, 291 SC at 392, 353 SE2d at 878; *see also Miller-Jenkins v Miller-Jenkins*, 180 Vt 441, 465-466, 912 A2d 951, 970-971 [Sup Ct 2006], *cert denied* 550 US —, 127 S Ct 2130 [2007] [written consent not statutorily required; same-sex partner held to be parent]; *L.M.S v S.L.S.*, 105 Wis 2d 118, 122-123, 312 NW2d 853, 855-856 [Ct App 1981] [no statutory provision for written consent]; *but see K.B. v N.B.*, 811 SW2d 634, 638 [Tex Ct App 1991], *cert denied* 504 US 918 [1992] [holding oral consent, alone, insufficient where statute requires consent in writing, but court imposed support obligation in light of father's ratification]).

Consistent with our State's strong presumption of legitimacy, as well as the compelling public policy of protecting children conceived via AID, we follow the lead of other jurisdictions that impose a rebuttable presumption of consent by the husband of a woman who conceives by AID, shifting the burden to the husband to rebut the presumption by clear and convincing evidence (*see e.g. In re Baby Doe*, 291 SC at 391, 353 SE2d at 878; *K. S. v G. S.*, 182 NJ Super 102, 109, 440 A2d 64, 68 [1981]; *People v Sorensen*, 68 Cal 2d 280, 283, 437 P2d 495, 497 [1968]; *but see Jackson v Jackson*, 137 Ohio App 3d 782, 795, 739 NE2d 1203, 1213 [2000] [burden on wife to prove consent by a preponderance of the evidence]). Although our Legislature has provided an avenue to avoid factual disputes essentially by creating an irrebuttable presumption of legitimacy where the prerequisites of the statute are met (*see* Domestic Relations Law § 73), the need for a rebuttable presumption also clearly exists, especially so in light of the evidence that medical personnel who conduct AID procedures are not always aware of statutory consent requirements (*see e.g. Anonymous v Anonymous*, 1991 WL 57753, *18 [Sup Ct, NY County 1991]; *Jackson v Jackson*, 137 Ohio App 3d at 793, 739 NE2d at 1211).

Turning to the specific issue before us, our review of the record reveals that the facts necessary to resolve the matter were either undisputed, or have been fully litigated before Supreme Court, rendering it appropriate to apply the rule of law announced herein without a remittal for further hearings. It is not disputed that the husband was fully aware that his wife was utilizing AID to get pregnant. Although he testified that he did not want a third child and that he had repeatedly told his wife that he did not think AID was "a good idea," at least until the couple had completed some counseling, he did not testify that he ever informed his wife that, should a child be born as a result of AID, he would not accept the child as his own. Indeed, he proffered no evidence that he took any steps before the AID was performed to demonstrate that he was not willing to be the child's father. Under these circumstances, we find that the husband failed to rebut the presumption that he consented to bringing a third child into the marriage through AID.

Even if we did not apply the rebuttable presumption, and instead placed the burden on the wife and Law Guardian to prove the husband's consent, we would find, as Supreme Court did, that the evidence demonstrates that the husband consented to the child's creation. The husband knew that his wife planned

to undergo the AID procedure and observed her picking out a donor based on characteristics which matched his own; he signed a "Frozen Donor Semen Specimen Agreement" which set forth the terms of purchase and delivery of the semen specimen; he faxed the donor agreement to the California-based sperm bank and paid for the specimen with a credit card; he stayed home to care for the other children to enable his wife to go to the doctor's office for insemination; and, significantly, he acknowledged in his testimony that had the couple stayed together, he would have accepted the child as his own.

The husband's assertion that his wife forced him to sign the donor agreement by threatening to leave him is of no consequence. Just as an individual who agrees and proceeds to create a child by conventional methods in an attempt to salvage a troubled marriage is held responsible for the care of the resulting child, so too should an individual who acquiesces to his spouse's demands that a child be conceived through AID be held responsible. Importantly, the separation agreement executed by both parties specifically states that "the unborn child is not the biological child of the husband, but was conceived through a *mutually agreed upon* course of artificial insemination" (emphasis added).

This evidence fully supports Supreme Court's conclusion that the husband consented to his wife's decision to create the child and that he is, therefore, the child's legal father. Indeed, pursuing an alternative avenue, we reach the same result, finding that the foregoing facts of this case also warrant application of the doctrine of equitable estoppel to preclude the husband from "seeking to disclaim paternity of the parties' child, whose best interest is paramount" (*Mancinelli v Mancinelli*, 203 AD2d 634, 635 [1994]; *see Brown v Brown*, 83 Ark App at 222, 125 SW3d at 843; *Levin v Levin*, 645 NE2d 601, 604-605 [Ind 1994]; *R.S. v R.S.*, 9 Kan App 2d at 44, 670 P2d at 927-928; *see also State of New York ex rel. H. v P.*, 90 AD2d at 440 [holding wife estopped from contesting husband's paternity of child conceived by AID]).

█ Finally, we reject the husband's assertion that Supreme Court erred in granting a judgment of divorce despite altering the terms of the parties' separation agreement. The separation agreement contains a severability clause which specifically provides for the present situation, stating that if any of its provisions "should be held to be contrary to or invalid under the law . . . such invalidity shall not affect in any way any other provision hereof." Inasmuch as the agreed upon support obliga-

tion for the two children included in the separation agreement is the amount reached by direct application of the Child Support Standards Act (*see* Domestic Relations Law § 240 [1-b]), altering the percentage to reflect the parties' third child does not require a new hearing or undermine the other provisions of the agreement. Under these circumstances, the divorce was properly granted (*see Christian v Christian*, 42 NY2d 63, 73 [1977]; *Sheridan v Sheridan*, 202 AD2d 749, 751-752 [1994]).

CARDONA, P.J., CARPINELLO, KAVANAGH and STEIN, JJ., concur.

Ordered that the judgment is affirmed, without costs.