OPINION
Robert and Julynn Roseborough were divorced in Greene County, Ohio, on April 6, 2001. Robert appeals from that judgment and contends, in two separate assignments of error, that the trial court erred in awarding custody of the parties' minor child to Julynn and in dividing retirement benefits inequitably.
After reviewing the record, we find that the first assignment of error does not have merit. However, the second assignment of error has merit and must be sustained. Accordingly, the decision of the trial court will be reversed and remanded for further proceedings.
 I
The Roseboroughs were married in 1983, while both were in the United States Air Force. Robert separated from the Air Force in September, 1986, due to a strength reduction, and was not eligible for a military pension. Julynn remained in the military for twenty years to earn a military retirement. Their son, Kyle, was born February 10, 1995.
From 1997 to 1999, Julynn was assigned to military duty in Honduras. During this time, Robert was Kyle's primary care giver. Robert also began a romantic relationship with another woman while Julynn was in Honduras. When Julynn returned, Robert filed for divorce. Although Robert had been the primary caregiver, Julynn was given temporary custody of Kyle in April, 2000. At trial, both Robert and Julynn presented testimony that they each had a loving and caring relationship with Kyle. In fact, each admitted that the other parent was loving and competent.
After the final divorce hearing, the trial court awarded Julynn permanent residential parent status. In this regard, the trial court made the following findings:
 When allocating parental rights the Court must consider all the relevant factors listed in R.C. 3109.04(F)(1). Both parents testified that the other parent is loving and competent. Numerous witnesses confirmed that both took an active role in Kyle's life. However, it is determined that the Defendant, along with the Plaintiff, has been a primary caretaker in the child's life. The Defendant has proven that she will honor and facilitate the Plaintiff's visitation and companionship rights, while the Plaintiff willfully denied the Defendant her visitation rights and hid the child from her in order to prevent her from seeing him; the Plaintiff withheld valuable information regarding the child's vaccination schedule from the Defendant and caused her to have the child vaccinated unnecessarily a second time so that he could be enrolled in kindergarten; the child has adjusted to his life with the Defendant and to the community; and he has extended family in the Columbus area where the Defendant now resides. Further, pursuant to R.C. 3109.04(C), Civil Rule 75(D) and Roach v. Roach
(1992), 79 Ohio App.3d 194, 203.4, 607 N.E.2d 35, a Home Study was performed and it recommended that the Defendant be named the residential parent. The report was signed by the investigator, submitted to the Court and to the parties within a timely fashion. Leslie Grayson, investigator for the Greene County Family Relations Services Division, presented testimony at trial and was subject to cross-examination.
In the first assignment of error, Robert contends the trial court abused its discretion by giving Julynn custody of Kyle. Robert feels that Kyle's best interests required an award of custody to Robert.
As support for this point, Robert claims that Julynn placed her military career ahead of her concern for Kyle. He also argues that his witnesses showed that he had a stronger relationship with his son than Julynn did. Specifically, Robert's stepmother testified that Robert was the primary care giver even before Julynn went to Honduras, because Robert did all the cooking, cleaning, and giving of night-time stories to Kyle.
Robert further contends that Kyle was better adjusted to Robert's Fairborn, Ohio home and had difficulty with the dislocation of moving with Julynn to Columbus. Additionally, Robert says that he never denied visitation privileges or refused to provide information about Kyle's vaccination schedule.
In response, Julynn says that the trial court did not abuse its discretion in giving her custody of Kyle. Julynn believes the trial court appreciated the fact that her military tour in Honduras was not optional, and that she risked loss of her retirement if she refused to obey orders. Julynn also points out that she returned for a second tour in Honduras only after Robert refused to go along with her alternate assignment to Omaha, Nebraska. And finally, Julynn contends that her decision to go to Honduras for a second tour was done with Robert's approval.
The statutory standard for custody decisions is written broadly and requires domestic relations judges to consider all factors that are relevant to the best interests of the child. R.C. 3109.04(B)(1) and (F)(1)(a)-(j). The purpose of this far-reaching inquiry is to let judges make fully informed decisions on the important issue of which parent will raise a child. "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record." Miller v. Miller
(1988), 37 Ohio St.3d 71, 74, 523 N.E.2d 846, 849 (citations omitted). A reviewing court will not overturn a custody determination unless the trial court has acted in a manner that is arbitrary, unreasonable, or capricious. Id.
We have carefully reviewed the record below and see no evidence that the trial court abused its discretion by awarding custody of Kyle to his mother. The evidence reveals that both parents are loving and caring parents. Moreover, the decision made by the trial court was in accord with the statutory guidelines and was not the product of caprice or arbitrariness. Accordingly, the first assignment of error is overruled.
 II
In his second assignment of error, Robert contends that the trial court divided the retirement benefits of the parties inequitably. Initially, Robert notes that the evidence indicates that he did not dissipate his retirement fund. Instead, he used the money for attorneys fees and debts. He also purchased items for the parties' home. Robert also points out that he cashed in the parties' mutual fund with his wife's consent and split the proceeds with her. Furthermore, Robert says he did not wrongfully cause his former wife to incur additional federal taxes by claiming Kyle as a dependent, or by claiming the mortgage interest paid on the marital home on his 1999 tax return. To the contrary, Robert feels he was entitled to these deductions, since he was Kyle's primary caregiver and lived in the marital home.
In any event, Robert contends that the only loss his former wife suffered was an additional tax and penalty of $2,568. In contrast to this slight loss, however, the trial court punished Robert inequitably by ordering him to forfeit all interest in his wife's military retirement, or about $75,067.
The evidence at trial revealed the following pertinent facts. After leaving the military, Robert obtained a job as a parts manager with While Allen Honda. During the time Robert worked for White Allen, he accumulated about $30,460 in a retirement plan. Shortly before the divorce, Robert cashed in the retirement plan and paid a 10% tax penalty of $3,046. He did not share any of this money with Julynn.
A mutual fund was also cashed in at some point. Although Robert did split this money with Julynn, he did not pay any capital gains tax, and left her with the additional tax liability. Robert took the tax exemption for Kyle in 1999, and also took sole credit for mortgage interest payments, even though Julynn's military pay was used to pay household expenses. The result was that Julynn owed an additional $2,568 in taxes for the year 1999.
The parties did not have significant assets besides Julynn's military pension and the martial residence. Robert received the residence, and Julynn was awarded one-half the equity, or $11,358.04. Instead of cash, Julynn received an offset against Robert's marital interest in the military pension. In dividing the parties' retirement benefits, the trial court made the following findings:
 Retirement Benefits — Pensions or retirement benefits accumulated during the course of marriage are marital assets subject to property division in a divorce action. However, R.C. 3105.171(C)(1) states that if an equal division of marital property would be inequitable, the court shall not divide the marital property equally but instead shall divide it between the spouses in the manner the court determines equitable. The Defendant performed her military service in an honorable manner. During the time the Defendant was stationed in Honduras, the Defendant dissipated his own retirement benefits without considering the tax consequences or the impact it would have on the family financially. He also caused her to pay additional taxes by not reporting a capital gain on a mutual fund that he cashed in; by taking the tax exemption for Kyle; and by taking all interest for the marital residence; thereby putting an unnecessary financial burden upon Defendant when the gain had to be reported on her federal return and resulted in the Defendant owing taxes in the amount of Two Thousand Five Hundred Sixty-eight Dollars ($2,568.00). The additional financial burden is not in the best interest of the child. The Defendant sacrificed two years of her life away from the minor child in order to preserve her military benefits for the good of the family unit and to placate the Plaintiff's desire not to relocate. Refusal of the Honduras tour of duty would have forced the Defendant to leave military duty before her pension was fully vested and would have deprived the family of all additional military privileges. Further, the Plaintiff had total control over the Defendant's military pay and used it for his personal interest. Therefore, it is determined that the Plaintiff's interest in the Defendant's military retirement shall be limited to the Twenty-six Thousand Seven Hundred Eighteen Dollars and Forty-four Cents ($26,718.44) in offsets he receives for Defendant's interest in the marital residence and her interest in both of his retirement plans. The remainder of the Defendant's retirement, along with all cost of living increases, is AWARDED to the Defendant IN GROSS and is to be hers alone, free and clear of any claim by the Plaintiff.
 Present Value of Defendant's Military Retirement $260,388.53
 Coverture Fraction 78.18% 203,572.01
Defendant's marital portion $101,786.00
Minus offset for dissipated 401(k) -15,230.00
 Minus offset for equity in marital residence -11,358.04
 Minus offset for Defendant's interest in The Trust Company of Toledo retirement Account -130.40
 Plaintiff's marital portion of Defendant's Military Retirement $ 75,067.36
 Defendant's marital portion of her Military Pension $200,680.93
 Plus In Gross award of Plaintiff's marital portion of military retirement $ 75,067.36
 Total Award of Military Pension Benefits to Defendant $260,388.53
 Total Award of Military Pension Benefits to Plaintiff $0.00
 The Plaintiff is currently participating in a retirement savings plan through his employer. The plan is managed by The Trust Company of Toledo and has a current value of Two Hundred Sixty Dollars ($260.00). The Defendant's marital portion is one-half of this amount or One Hundred Thirty Dollars ($130.00). This amount will be off-set against the Plaintiff's interest in the Defendant's military pension and illustrated above.
(Emphasis in original).
In dividing the parties' marital debt the trial court made the following further observations:
Marital Debt
 The Plaintiff testified that the First Star credit card and the Capital One credit card was used exclusively by the Defendant while she was stationed in Honduras. The Court is also aware that all of the Defendant's military pay was sent to the Plaintiff for the family's benefit. This factor was an additional factor that was considered when the Defendant's military retirement was awarded to her in gross. Because the cards were used by the Defendant exclusively, she is ORDERED to assume all financial responsibility for the Seven Thousand Seven Hundred Dollar ($7,700.00) balance owed on the First Star credit card and the Capital One credit card in the amount of Two Thousand Three Hundred Thirty-two Dollars ($2,332.00). She will hold the Plaintiff harmless for any remaining debt associated with the cards.
(Emphasis in original).
Robert does not dispute that the trial court could fashion an appropriate remedy for financial misconduct. However, he claims that he did not commit misconduct and that the court's remedy was unnecessarily punitive.
Regarding financial misconduct, R.C. 3105.171(E)(3) provides that:
 If a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property.
A court's decision whether to compensate an offended spouse is reviewed for abuse of discretion. See, e.g., Forster v. Forster (July 29, 1999), Cuyahoga App. No. 74137, unreported, 1999 WL 561522 at p. 3. Abuse of discretion implies that the court's attitude is "unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,219. Additionally, the party who is offended has the burden of proving financial misconduct. Hammond v. Brown (Sept. 14, 1995), Cuyahoga App. No. 67268, unreported, 1995 WL 546903, at p. 3.
Robert admitted at trial that he withdrew his retirement without consulting his wife and spent some of it to pay his attorney. However, he did not testify as to any particular amount that he spent on this expense. Additionally, Robert provided very unspecific testimony on how he used the rest of the retirement money, stating only that he "paid off some debts, bought a lot of stuff for the house." (T.138). The trial court did not have to believe Robert's testimony, which was vague, at best. See, e.g., Murello Const. Co. v. Citizens Home Sav. Co. (1985),29 Ohio App.3d 333. Instead, the court could give Robert's testimony the weight it deemed proper. Id. On the other hand, if the court found misconduct, the remedy had to be reasonable.
We have often said that "[d]ecisions are unreasonable if they are unsupported by a sound reasoning process." Jackson v. Jackson (2000),137 Ohio App.3d 782, 799, citing AAAA Enterprises, Inc. v. River PlaceCommunity Urban Redevelopment Corp. (1990), 50 Ohio St.3d 157. After reviewing the record in this case, we are unable to find a sound reasoning process for the trial court's action. Even if we assume that Robert committed financial misconduct, the trial court's action was highly disproportionate, since it went far beyond "compensating" Julynn. Compare DiLacqua v. DiLacqua (1993), 88 Ohio App.3d 48, 62 (indicating that where husband dissipated $26,300 in marital assets, he would have to pay wife $13,150 from sale of marital home to fully compensate for dissipated assets). This interpretation is consistent with the general concept of compensatory damages, which are "intended to make whole the plaintiff for the wrong done to him or her by the defendant." Fantozzi v.Sandusky Cement Prod. Co. (1992), 64 Ohio St.3d 601, 612.
In the present case, the trial court properly reduced Robert's share of the pension by $26,718.44, to account for Julynn's equity in the house, the amount dissipated from Robert's White Allen retirement account, and the amount of Julynn's interest in Robert's current retirement plan. Based on these figures, Robert would have had a remaining interest in Julynn's retirement of about $75,067.56. The trial court could also have made further reductions to compensate for the increased taxes and Julynn's assumption of marital debts. Specifically, the debt was incurred during the marriage, for expenses in Honduras, at a time when Julynn's military paycheck was being deposited in a joint account and used to cover household expenses. However, we think the notion of compensation ends there, since the purpose is to neutralize losses caused by the offending spouse's conduct. We also note that the trial court's use of a $200,680.93 figure for Julynn's "marital portion of her military pension" is in error. We could not find any basis for that figure anywhere in the record.
Accordingly, since the trial court abused its discretion in distributing Julynn's pension, the second assignment of error is sustained. On remand, the trial court should recalculate the appropriate deduction from the military pension. In this regard, we note that the trial court does not have to order that Julynn pay Robert a lump sum amount to compensate for his share of the pension. Instead, the court can issue a Qualified Domestic Relations Order (QDRO), requiring that a specific fraction of Julynn's pension benefits be paid directly to Robert. See, e.g., Randolph v. McCullough (Sept. 21, 2000), Mahoning App. No. 99-CA-161, unreported, 2000 WL 1486490. In Randolph, the Seventh District Court of Appeals listed the four most common methods of dividing retirement benefits accumulated during marriage:
 "(1) withdrawing the entire employee's share from the fund; (2) offsetting the present value of the nonemployee spouse's equitable share with other marital property; (3) offsetting the present value of the nonemployee's equitable share with installment payments; or (4) ordering that a percentage of the future benefit be paid, directly from the fund to the nonemployee spouse, if and when the pension matures."
2000 WL 1486490, p. 4 (citations omitted). The Seventh District noted that the fourth option is now permissible for dividing military pensions. Specifically, the court commented that:
 In response to the United States Supreme Court's decision in McCarty v. McCarty (1981), 453 U.S. 210, that state courts could not treat military retirement benefits as marital property, the United State's Congress passed the Former Spouses Protection Act. Mansell v. Mansell (1989) 490 U.S. 581, 584. The Act authorizes state courts to treat retirement benefits as marital property. Id., 584-585, citing 10 U.S.C. § 1408(c)(1).
 "The Act also creates a payments mechanism under which the Federal Government will make direct payments to a former spouse who presents, to the Secretary of the relevant military service, a state-court order granting her a portion of the military retiree's disposable retired or retainer pay. This direct payments mechanism is limited in two ways. § 1408(d). First, only a former spouse who was married to a military member `for a period of 10 years or more during which the member performed at least 10 years of service creditable in determining the member's eligibility for retired or retainer pay,' § 1408(d)(2), is eligible to receive direct [marital] property payments. Second, the Federal Government will not make community property payments that exceed 50 percent of disposable retired or retainer pay. § 1408(e)(1)."
2000 WL 1486490, at 4-5. Therefore, on remand, the trial court may issue a proper order granting an appropriate percentage of Julynn's military pension to Robert.
In light of the preceding discussion, the first assignment of error is overruled and the second assignment of error is sustained. This case is hereby reversed and remanded for further proceedings consistent with this opinion.
WOLFF P.J., and GRADY, J., concur.