[28 NYS3d 714]

In the Matter of KELLY S., Respondent, v FARAH M., Appellant.

Second Department, April 6, 2016

*Friedman & Friedman*, Garden City (*Sari M. Friedman* and *Latonia Early* of counsel), for appellant.

*Christopher J. Chimeri*, Hauppauge (*Douglas Byrne* of counsel), for respondent.

*Regina M. Stanton*, Port Jefferson, Attorney for the Children.

**OPINION OF THE COURT**

ROMAN, J.

Kelly S. and Farah M. entered into a registered domestic partnership in California in 2004, and were legally married in California in 2008. During their time together, Farah M. conceived two children through artificial insemination, and those children were born in March 2007 and April 2009, respectively. The parties relocated to New York and later separated. Kelly S. moved to Arizona, while Farah M. remained in New York with the children. On this appeal, we primarily consider whether, as a matter of comity, the Family Court properly recognized Kelly S. as a parent of the children under New York law, thereby conferring standing for her to seek visitation with the children, notwithstanding the parties' failure to comply with California's artificial insemination law.

For the reasons that follow, we answer this question in the affirmative.

Factual and Procedural Background

Kelly S. and Farah M. began a romantic relationship in or around March 2000. In January 2004, the parties entered into a registered domestic partnership in California. In 2004, the parties decided to start a family, and asked nonparty Anthony S., a close friend of both parties, if he would be willing to donate his sperm. Anthony S. agreed to donate his sperm, and Kelly S. became pregnant through artificial insemination. In January 2005, Kelly S. gave birth to I.S., who is not a subject of this appeal. Farah M. legally adopted I.S.

The parties subsequently decided to have another child, and Anthony S. again agreed to be the sperm donor. On this occasion, Farah M. became pregnant by artificial insemination. The artificial insemination procedure was performed at home by Farah M., rather than by a physician, and the parties did not draft or sign a written consent agreement. On March 24, 2007, Farah M. gave birth to the subject child Z.S. The child was given Kelly S.'s surname, and Kelly S. was listed as a parent on the child's birth certificate.

In August 2008, the parties were legally married in California. That same year, they decided to have a third child, and Farah M. became pregnant through artificial insemination, with Anthony S. once again donating the sperm. The artificial insemination procedure was again performed at home by Farah M., and not by a physician. Farah M. gave birth to the subject child E.S. on April 27, 2009. As with Z.S., E.S. was given Kelly S.'s surname, and Kelly S. was listed as a parent on the child's birth certificate.

In or around 2012, the parties relocated with the three children to New York. The parties subsequently separated, and Kelly S. moved to Arizona in or around the summer of 2013, while Farah M. remained in New York with the three children.

In May 2014, Kelly S. filed a visitation petition in the Family Court, Suffolk County, seeking visitation with Z.S. and E.S. The petition alleged that Kelly S. was the mother of the subject children and that the parties were legally married in California in 2008. In addition, the petition alleged that the children were given Kelly S.'s surname and that Kelly S. was listed on the children's birth certificates. The petition further alleged that Kelly S. helped raise the children until the parties separated.

In August 2014, Farah M. moved to dismiss Kelly S.'s visitation petition on the ground that Kelly S. lacked standing to seek parenting time with the subject children. In the alternative, she moved to schedule a hearing on the issue of standing, and to join the subject children's biological father, Anthony S., as an additional necessary party to the proceeding. Farah M. also filed paternity petitions against Anthony S. seeking to establish his paternity of Z.S. and E.S. In support of the motion, Farah M. pointed out that, while Kelly S. alleged that she was the mother of both children pursuant to a legal marriage in California, Z.S. was actually born prior to the parties' marriage. Since Z.S. was born prior to the marriage, Farah M. thus maintained that Kelly S. clearly lacked standing to seek parenting time with him because she was not his biological parent and had never legally adopted him. With respect to E.S., who was born during the parties' marriage, Farah M. argued that Kelly S. could not be deemed a parent under New York's artificial insemination statute because E.S. was conceived by means of an artificial insemination procedure performed by Farah M., not by a physician, and the parties did not draft or execute a written consent agreement authorizing the procedure, as required by Domestic Relations Law § 73.

Farah M. further argued that any presumption that E.S. was the child of both parties was rebutted by the fact that the sperm was provided, not by an anonymous donor, but by an individual who subsequently maintained a parental relationship with E.S. Lastly, Farah M. argued that if the visitation petition was not dismissed, then Anthony S. should be named as an additional necessary party to the proceeding, since he had not abandoned or otherwise surrendered his parental rights, and he continued to maintain a father-child relationship with the subject children.

In a supporting affidavit, Farah M. alleged that Anthony S., in addition to being the sperm donor, had acknowledged paternity of both Z.S. and E.S. by engaging in a parental relationship with them. In this regard, Farah M. alleged that Anthony S. had regularly spoken with the children over the telephone since they were toddlers, sent them cards signed "Daddy," given them birthday gifts, engaged in sleepovers, and accepted Father's Day gifts from them. Further, Farah M. averred that both children knew Anthony S. as their father, and referred to him as "Daddy." Farah M. also alleged that Anthony S. referred to both Z.S. and E.S. as his children, and that E.S. drew family pictures which included him.

In opposition to the motion, Kelly S. argued that, in view of the well-established presumption that a child born to a marriage is the product of that marriage, Kelly S. must be recognized as a parent of E.S., who was born after the parties were legally married. As to Z.S., Kelly S. argued that courts have applied the doctrine of equitable estoppel in determining parentage, and that it was in the best interest of Z.S. for Kelly S. to be recognized as his parent.

In her supporting affidavit, Kelly S. averred that she was supportive at all times and assisted with both artificial insemination procedures. She also asserted that, from birth to the present, all of the parties' children "look at [her] as their mother and affectionately call [her] 'Mama.'"

The Attorney for the Children also opposed Farah M.'s motion. Counsel argued that the motion should be denied in its entirety as to E.S, since that child was born during the parties' marriage. With respect to Z.S., the Attorney for the Children requested a hearing to determine whether Kelly S. had standing to seek visitation. The Attorney for the Children argued that a hearing was necessary to determine whether Farah M. should be equitably estopped from disputing Kelly S.'s status as a parent of Z.S.

In reply, Farah M. argued, with respect to Z.S., that the doctrine of equitable estoppel was inapplicable. Farah M. noted that Kelly S. had the opportunity to adopt the subject children, but chose not to do so, and that the children had a relationship with their biological father. In addition, Farah M. reiterated her contention that Kelly S. did not have standing to seek visitation with E.S., inasmuch as the parties did not comply with the provisions of Domestic Relations Law § 73, and the sperm was provided by a known donor.

The Order Appealed From

In an order dated March 13, 2015, the Family Court denied Farah M.'s motion to dismiss the visitation petition on the ground of lack of standing, concluding that since both children were born when the parties were registered domestic partners or married, Kelly S. was presumed to be a parent under California law, and that presumption should be afforded comity. The court also, sua sponte, dismissed the paternity petitions filed by Farah M. After discussing the facts of the case and the doctrine of comity, the court determined that "the parties' decade long history and residence in California," and the Court of Appeals decision in *Debra H. v Janice R.* (14 NY3d 576

[2010]), warranted the application of California law to this matter. The court noted that the parties did not comply with the artificial insemination laws of either California or New York, and, therefore, those statutes did not provide a basis for treating Kelly S. as a parent. Nevertheless, after analyzing the presumption of parentage arising under California law for children born of a marriage (see Cal Fam Code § 7611), as well as the California law for registered domestic partnerships (see Cal Fam Code § 297.5 [d]), the court determined that when Z.S. was born in 2007, while the parties were living together in a registered domestic partnership, California law afforded them the same rights and obligations with respect to Z.S. as if they were married spouses. The court concluded that Kelly S. was presumed to be the parent of both Z.S. and E.S. pursuant to California Family Code § 7611 (a).

Turning to the paternity petitions, the Family Court concluded that Farah M.'s "belated and self serving concerns over the children's biological origins" were motivated "solely [by] the apparent acrimony between the parties," and were not based on the best interests of the children. The court noted that Anthony S. was not seeking to establish his paternity, but that it was Farah M. "who [had] hauled [him] into these proceedings with the obvious goal of obfuscating and eventually terminating Kelly S.'s parentage of and parental rights to Z.S. and E.S."

In sum, as a matter of comity, the Family Court recognized Kelly S.'s parentage of Z.S. and E.S., and held that Kelly S. had standing to seek custody and visitation with the subject children at a best interests hearing.

Discussion

Farah M. argues that the parties failed to comply with California's artificial insemination law, and, thus, California would not recognize Kelly S. as the parent of the subject children. Further, Farah M. contends that the parties' previous relationship cannot be relied upon to establish Kelly S.'s parentage in New York. In this regard, Farah M. contends that the rule in New York is that a partner in a same-sex relationship, regardless of the form of the legal relationship between the parties, who is not the biological mother of the child and has not legally adopted the child, has no standing to seek visitation when a fit biological parent opposes the application.

Recently, in *Obergefell v Hodges* (576 US —, —, 135 S Ct 2584, 2607-2608 [2015]), the United States Supreme Court

granted same-sex couples the fundamental right to marry in all states, and declared that there is no lawful basis for a state to refuse to recognize a lawful same-sex marriage performed in another state based solely on its same-sex character. It has long been New York's marriage recognition rule to afford comity to out-of-state marriages, and to " 'recognize[ ] as valid a marriage considered valid in the place where celebrated' " (*Matter of Ranftle*, 81 AD3d 566, 567 [2011], quoting *Van Voorhis v Brintnall*, 86 NY 18, 25 [1881]). While a marriage in another state will not be recognized where it is "contrary to the prohibitions of natural law or the express prohibitions of a statute" (*Moore v Hegeman*, 92 NY 521, 524 [1883]), even prior to the United States Supreme Court's 2015 decision in *Obergefell*, "[s]ame-sex marriage [did] not fall within either of the two exceptions to the marriage recognition rule" (*Matter of Ranftle*, 81 AD3d at 567). Indeed, on June 24, 2011, the New York Legislature enacted the Marriage Equality Act (L 2011, ch 95 [eff July 24, 2011]), permitting marriage between persons of the same sex. Section 3, codified at Domestic Relations Law § 10-a, provides that "[a] marriage that is otherwise valid shall be valid regardless of whether the parties to the marriage are of the same or different sex," and that

> "[n]o government treatment or legal status, effect, right, benefit, privilege, protection or responsibility relating to marriage, whether deriving from statute, administrative or court rule, public policy, common law or any other source of law, shall differ based on the parties to the marriage being or having been of the same sex rather than a different sex" (L 2011, ch 95, § 3).

The legislative intent of the Marriage Equality Act was set forth in section 2 of the Act as follows:

> "Marriage is a fundamental human right. Same-sex couples should have the same access as others to the protections, responsibilities, rights, obligations, and benefits of civil marriage. Stable family relationships help build a stronger society. For the welfare of the community and in fairness to all New Yorkers, this act formally recognizes otherwise-valid marriages without regard to whether the parties are of the same or different sex.

"It is the intent of the legislature that the marriages of same-sex and different-sex couples be treated equally in all respects under the law. The omission from this act of changes to other provisions of law shall not be construed as a legislative intent to preserve any legal distinction between same-sex couples and different-sex couples with respect to marriage" (L 2011, ch 95, § 2).

The enactment of the Marriage Equality Act makes clear that affording comity to lawful same-sex marriages performed in other states was consistent with New York's public policy even prior to *Obergefell*. Indeed, prior to the enactment of the Marriage Equality Act, the Court of Appeals had already recognized that New York should afford comity to recognize parentage in a same-sex relationship created under a sister state's law. In *Debra H. v Janice R.* (14 NY3d at 586-587), the petitioner, Debra H., commenced a proceeding against the respondent, Janice R., in the Supreme Court seeking, inter alia, joint legal and physical custody of the subject child M.R., who had been conceived by Janice R. through artificial insemination. The parties had entered into a civil union in Vermont in November 2003, one month before M.R.'s birth (*see id.* at 586). However, Janice R. had rebuffed Debra H.'s requests to become M.R.'s legal parent by means of adoption (*see id.*).

Initially, the Court of Appeals reaffirmed its earlier holding in *Matter of Alison D. v Virginia M.* (77 NY2d 651 [1991]). In that case, the Court had rejected the claims of the petitioner therein, who was neither the biological mother of the subject child nor a legal parent by adoption, that she had standing to seek visitation with the child based on having acted as a " 'de facto' " parent, or that she should be viewed as a parent " 'by estoppel' " (*id.* at 656). The Court in *Debra H.* reiterated that, under the Domestic Relations Law, a biological stranger does not have standing to seek visitation with a child in the custody of a fit parent, and that "parentage under New York law derives from biology or adoption" (*Debra H. v Janice R.*, 14 NY3d at 593). However, this did not end the Court's inquiry. The Court determined that the fact that Debra H. and Janice R. had entered into a Vermont civil union prior to the subject child's birth established Debra H.'s parentage under Vermont law (*see id.* at 598-599). The Court relied on the Vermont Supreme Court's decision in *Miller-Jenkins v Miller-Jenkins* (180 Vt 441, 912 A2d 951 [2006]), which held that a child born by

artificial insemination to one partner of a civil union should be deemed the child of the other partner under Vermont law for purposes of determining custodial rights following the dissolution of the civil union (*see Debra H. v Janice R.*, 14 NY3d at 598-599). Moreover, the Court afforded comity to Vermont, and recognized Debra H. as the child's parent under New York law as well, thereby conferring standing on Debra H. to seek visitation and custody at a best interests hearing (*see id.* at 599-600). The Court reasoned as follows:

> "New York will accord comity to recognize parentage created by an adoption in a foreign nation. We see no reason to withhold equivalent recognition where someone is a parent under a sister state's law. Janice R., as was her right as M.R.'s biological parent, did not agree to let Debra H. adopt M.R. But the availability of second-parent adoption to New Yorkers of the same sex negates any suggestion that recognition of parentage based on a Vermont civil union would conflict with our State's public policy. Nor would comity undermine the certainty that *Alison D.* promises biological and adoptive parents and their children: whether there has been a civil union in Vermont is as determinable as whether there has been a second-parent adoption. And both civil union and adoption require the biological or adoptive parent's legal consent, as opposed to the indeterminate implied consent featured in the various tests proposed to establish de facto or functional parentage. In sum, our decision does not lead to protracted litigation over standing and is consistent with New York's public policy by affording predictability to parents and children alike" (*id.* at 600-601 [citation omitted]).

This Court applied the rationale of *Debra H.* under circumstances similar to the instant case in *Counihan v Bishop* (111 AD3d 594, 595 [2013]). In *Counihan*, the parties were married in Connecticut in 2009, and returned to live in New York (*see id.*). The parties thereafter decided to have a child and the defendant became pregnant via artificial insemination (*see id.*). The subject child was born in September 2010 (*see id.*). In 2012, the parties separated, and the plaintiff subsequently commenced an action for a divorce and ancillary relief, and moved for custody of the child, or, in the alternative, visitation (*see id.*). The defendant cross-moved for sole custody of the child

(*see id.*). The Supreme Court determined that the plaintiff lacked standing to seek custody or visitation because she was not the child's biological or adoptive parent (*see id.*). On appeal, this Court reversed. This Court, citing *Debra H.* (14 NY3d at 599-601), held that "[a]lthough, at the time of the child's birth, New York had not yet enacted the Marriage Equality Act (*see* L 2011, ch 95), affording comity to the parties' Connecticut marriage, the Supreme Court should have recognized the plaintiff as the child's parent under New York law" (*Counihan v Bishop*, 111 AD3d at 595). Accordingly, it is clear that if Kelly S. is the parent of the children under California law, principles of comity require her to be recognized as a parent in New York.

Turning to the issue of whether Kelly S. is presumed to be the natural parent of both Z.S. and E.S. under California law, "[t]he determination of parentage is governed by the Uniform Parentage Act" (*K.M. v E.G.*, 37 Cal 4th 130, 138, 117 P3d 673, 678 [2005], citing Cal Fam Code § 7600 *et seq.*). California Family Code § 7611 (a) provides, in relevant part, that "[a] person is presumed to be the natural parent of a child if . . . [t]he presumed parent and the child's natural mother are or have been married to each other and the child is born during the marriage." That same presumption applies to children of registered domestic partners by operation of California Family Code § 297.5 (d), which states that "[t]he rights and obligations of registered domestic partners with respect to a child of either of them shall be the same as those of spouses." Further, California Family Code § 7611 (c) (1) provides that

> "[a] person is presumed to be the natural parent of a child if . . . [a]fter the child's birth, the presumed parent and the child's natural mother have married . . . each other by a marriage solemnized in apparent compliance with law . . . and . . . [w]ith his or her consent, the presumed parent is named as the child's parent on the child's birth certificate."

■ ■ Here, the parties first entered into a registered domestic partnership in California in 2004, prior to the birth of Z.S., and thus, Kelly S. was the presumed parent of Z.S. by virtue of the parties' status as registered domestic partners (*see* Cal Fam Code §§ 297.5 [d]; 7611 [a]). Moreover, Kelly S. gave her consent to be named as a parent on the birth certificate of Z.S., and the parties were later married in California in August 2008, making Kelly S. the presumed par-

ent of Z.S. pursuant to California Family Code § 7611 (c) (1). After the parties' marriage, the child E.S. was born. Thus, Kelly S. is presumed to be the natural parent of E.S. by virtue of the parties' marriage pursuant to California Family Code § 7611 (a). Furthermore, the Family Court, as a matter of comity, properly recognized Kelly S. as the parent of the subject children under New York law (*see Debra H. v Janice R.*, 14 NY3d at 600-601; *Counihan v Bishop*, 111 AD3d at 595).

■ Contrary to Farah M.'s contention, the parties' failure to comply with California's artificial insemination law does not preclude the recognition of Kelly S.'s parentage under California law. The version of California Family Code § 7613 in effect at the time the order appealed from was issued provided as follows:

> "(a) If, under the supervision of a licensed physician and surgeon and with the consent of her spouse, a woman conceives through assisted reproduction with semen donated by a man not her husband, the spouse is treated in law as if he or she were the natural parent of a child thereby conceived. The spouse's consent shall be in writing and signed by both spouses. The physician and surgeon shall certify their signatures and the date of the assisted reproduction procedure, and retain the spouse's consent as part of the medical record, where it shall be kept confidential and in a sealed file. However, the physician and surgeon's failure to do so does not affect the parent and child relationship. . . .

> "(b) The donor of semen provided to a licensed physician and surgeon or to a licensed sperm bank for use in assisted reproduction of a woman other than the donor's spouse is treated in law as if he were not the natural parent of a child thereby conceived, unless otherwise agreed to in a writing signed by the donor and the woman prior to the conception of the child."

Here, the artificial insemination procedures were performed at home by Farah M., rather than under the supervision of a licensed physician and surgeon, and the parties did not draft or sign a written consent agreement. However, the parties' failure to comply with the requirements of California Family Code § 7613 only means that the presumption established by that statute may not be relied upon to establish Kelly S.'s

parentage. Kelly S. is still entitled to the presumption of parentage arising under California Family Code §§ 297.5 (d) and 7611 (a) and (c) (1), as discussed above.

Farah M. further argues that since the parties failed to satisfy the requirements of New York's artificial insemination law, Domestic Relations Law § 73, "the public policy of Domestic Relations Law § 73 would prohibit" recognition of Kelly S. as the parent of the subject children. However, the failure to comply with Domestic Relations Law § 73 does not automatically preclude recognition of parental rights. In *Laura WW. v Peter WW.* (51 AD3d 211 [2008]), the Appellate Division, Third Department, rejected an attempt by a husband to invoke the parties' noncompliance with Domestic Relations Law § 73 as a bar to a finding that he was legally the father of a child born to his wife and conceived as result of artificial insemination by donor during the marriage (*see id.* at 213-214). The Court noted the requirements of Domestic Relations Law § 73, which provides as follows:

> "1. Any child born to a married woman by means of artificial insemination performed by persons duly authorized to practice medicine and with the consent in writing of the woman and her husband, shall be deemed the legitimate, birth child of the husband and his wife for all purposes.

> "2. The aforesaid written consent shall be executed and acknowledged by both the husband and wife and the physician who performs the technique shall certify that he had rendered the service."

The Third Department held that "[g]iven the clear and specific language making written consent a prerequisite to invoking the statute's protections, we cannot find that the statute applies where, as here, it is conceded that the husband did not consent in writing to the procedure" (*id.* at 214). However, the Court found that "[n]either the language nor legislative history of Domestic Relations Law § 73 suggests that it was intended to be the exclusive means to establish paternity of a child born through the [artificial insemination by donor] procedure" (*id.* at 214-215). The Court relied, instead, on the common-law "rebuttable presumption that . . . a child born to a married woman, is the legitimate child of both parties," which the Court recognized was " 'one of the strongest and most persuasive known to the law' " (*id.* at 216, quoting *State of New York ex rel. H. v P.*, 90 AD2d 434, 437 [1982]

[internal quotation marks omitted]). The Court stated as follows:

> "Consistent with our State's strong presumption of legitimacy, as well as the compelling public policy of protecting children conceived via AID [artificial insemination by donor], we follow the lead of other jurisdictions that impose a rebuttable presumption of consent by the husband of a woman who conceives by AID, shifting the burden to the husband to rebut the presumption by clear and convincing evidence. Although our Legislature has provided an avenue to avoid factual disputes essentially by creating an irrebuttable presumption of legitimacy where the prerequisites of the statute are met (*see* Domestic Relations Law § 73), the need for a rebuttable presumption also clearly exists, especially so in light of the evidence that medical personnel who conduct AID procedures are not always aware of statutory consent requirements" (*Laura WW. v Peter WW.*, 51 AD3d at 217 [citations omitted]).

The Third Department determined that the husband had failed to rebut the presumption that he consented to bringing the subject child into the marriage through artificial insemination by donor (*see id.* at 217). The Court also noted that, even if it did not apply the rebuttable presumption, and instead placed the burden on the wife to prove the husband's consent, the evidence demonstrated that the husband consented to the child's creation (*see id.* at 217-218). Alternatively, the Court found that the husband was equitably estopped from seeking to disclaim paternity (*see id.*). As the decision in *Laura WW.* reflects, New York public policy does not preclude recognition of parental rights based upon the failure to strictly comply with Domestic Relations Law § 73.

Also instructive is *Wendy G-M. v Erin G-M.* (45 Misc 3d 574 [Sup Ct, Monroe County 2014]), where the Family Court, Monroe County, addressed the issue of noncompliance with Domestic Relations Law § 73 in the context of a same-sex marriage. In that case, the parties were married in a civil ceremony in Connecticut and a child conceived through artificial insemination was born during the marriage (*see id.* at 575). Although both parties and the physician signed a consent form agreeing to the artificial insemination procedures, there was no acknowledgment to the signatures (*see id.*). After the par-

ties' relationship deteriorated, the birth mother would not permit her spouse to visit with the child, and the spouse made an application for access to the child (*see id.* at 576). The court noted that the lack of an acknowledgment rendered the signed consent form ineffective under Domestic Relations Law § 73 (*see id.* at 584). However, the court determined that compliance with Domestic Relations Law § 73 was not the only way for a non-biological spouse to acquire parental status for a child born by artificial insemination of the other spouse (*see id.* at 592). The court reasoned that

> "[a] contrary finding would make a child's parentage for his or her entire life depend on a notary public being present when the parties signed the consent. The absence of the notary alone would then deny the non-biological spouse one of the primary benefits of marriage. . . . The presumption of parental status for children born into a marriage should not be so easily discarded because the married couple, who planned for the child and celebrated its arrival, then encounter marital troubles" (*id.*).

The Family Court determined that the spouse was presumed, by virtue of the parties' marriage, to be a parent of the child, and that "[a]s in *Laura WW. v Peter WW.*, the marital presumption of legitimacy created a presumption of consent in the AID context for this couple" (*id.* at 593).

█ In the present case, we similarly find that the parties' failure to comply with the requirements of Domestic Relations Law § 73 does not preclude recognition of Kelly S. as a parent of the children (*see Laura G. v Peter G.*, 15 Misc 3d 164, 169 [Sup Ct, Delaware County 2007]).

█ With respect to the dismissal of Farah M.'s paternity petitions, the Family Court determined that Anthony S. was not seeking to establish his paternity, and that Farah M. had filed the petitions in an attempt to terminate Kelly S.'s parental rights. The record reflects that the parties made an informed, mutual decision to conceive the subject children via artificial insemination and to raise them together, first while in a registered domestic partnership in California and, later, while legally married in that state. Additionally, the children were given Kelly S.'s surname, Kelly S. was named as a parent on each birth certificate, and the parties raised the children from the time of their births, in March 2007 and April 2009,

respectively, until the parties separated in or around the summer of 2013. Under the circumstances presented, the court properly determined that Farah M. may not rebut the presumption of parentage in favor of Kelly S. arising under California law by filing paternity petitions against the sperm donor (*see Laura WW. v Peter WW.*, 51 AD3d at 215-218; *State of New York ex rel. H. v P.*, 90 AD2d at 440-441; *see also* Allison J. Stone, Comment, *"Sisters Are Doin' It for Themselves!" Why the Parental Rights of Registered Domestic Partners Must Trump the Parental Rights of Their Known Sperm Donors in California*, 41 USFL Rev 505 [Winter 2007]), and correctly determined that Kelly S. has standing to seek visitation with the subject children at a best interests hearing.

In light of our determination that Kelly S. has standing to seek visitation, we need not reach her contention concerning whether New York, as a matter of comity, would apply California's law permitting parentage by estoppel (*see* Cal Fam Code § 7611 [d]).

The remaining contentions of the parties and the attorney for the children are either without merit or not properly before this Court.

Accordingly, the order is affirmed.

LEVENTHAL, J.P., DICKERSON and HINDS-RADIX, JJ., concur.

Ordered that the order is affirmed, with costs.

---

Motion by Farah M., inter alia, for leave to appeal to this Court from so much of an order of the Family Court, Suffolk County, dated March 13, 2015, as denied that branch of her motion which was to dismiss the visitation petition of Kelly S. By decision and order on motion of this Court dated April 27, 2015, that branch of the motion was held in abeyance and referred to the panel of Justices hearing the appeal for determination upon the argument or submission thereof.

Upon the papers filed in support of the motion, the papers filed in opposition thereto, and the argument of the appeal, it is

Ordered that the branch of the motion which was for leave to appeal to this Court from so much of an order of the Family Court, Suffolk County, dated March 13, 2015, as denied that

branch of the motion of Farah M. which was to dismiss the visitation petition of Kelly S. is granted.

LEVENTHAL, J.P., DICKERSON, ROMAN and HINDS-RADIX, JJ., concur.