Matter of Christopher YY. v Jessica ZZ. (2018 NY Slip Op 00495)





Matter of Christopher YY. v Jessica ZZ.


2018 NY Slip Op 00495


Decided on January 25, 2018


Appellate Division, Third Department


Mulvey, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: January 25, 2018

522068

[*1]In the Matter of CHRISTOPHER YY., Respondent,
v
JESSICA ZZ., Appellant, and NICHOLE ZZ., Respondent.

Calendar Date: October 19, 2017

Before: Egan Jr., J.P., Devine, Clark, Mulvey and Rumsey, JJ.


Ouida F. Binnie-Francis, Elmira, for appellant.
Pamela B. Bleiwas, Ithaca, for Christopher YY., respondent.
Lisa A. Natoli, Norwich, for Nichole ZZ., respondent.
Michelle E. Stone, Vestal, attorney for the child.


Mulvey, J.

Appeal, by permission, from an amended order of the Family Court of Chemung County (Tarantelli, J.), entered November 23, 2015, which, in a proceeding pursuant to Family Ct Act article 5, among other things, denied respondents' motion to dismiss the petition.
Respondent Jessica ZZ. (hereinafter the mother) and respondent Nichole ZZ. (hereinafter the wife) were married prior to the mother giving birth to the subject child in August 2014. It is undisputed that the child was conceived, on the second attempt, through an informal artificial insemination process performed in respondents' home using sperm donated by petitioner. The parties, who had known one another for a short time through family, had discussed respondents' desire to have a child together, and petitioner volunteered to donate his sperm for this purpose. The parties agree that petitioner, with his partner present, knowingly provided his sperm to assist respondents in having a child, and that the wife performed the insemination. Prior to the insemination, the parties had entered into a written agreement drafted [*2]by petitioner that was signed by respondents and petitioner in the presence of his partner. Pursuant to that written agreement, which was entered into without formalities or the benefit of legal advice, petitioner volunteered to donate his sperm so that respondents could have a child together, expressly waived any claims to paternity with regard to any child conceived from his donated sperm and further waived any right to custody or visitation, and respondents, in turn, waived any claim for child support from petitioner [FN1]. At some point after the birth of the child, the parties disagreed on petitioner's access to the child, and his partner subsequently admitted in sworn testimony that she had destroyed the only copy of that agreement. The legality of that agreement is not before this Court, although it is relevant to the parties' understanding, intent and expectations at the time that petitioner donated his sperm and the wife impregnated the mother (compare Laura WW. v Peter WW., 51 AD3d 211, 213-214 [2008]). Upon her birth, the child was given the wife's surname, and respondents lived together as a family with the child and the mother's other two children. Petitioner did not see the child until she was one or two months old.
In April 2015, petitioner filed this paternity petition (see Family Ct Act § 522) and, later, a petition seeking custody of the child. The mother opposed the request for a paternity test, requested a stay of any testing and a hearing, and apparently filed a cross petition for custody. At Family Court's direction, the wife was added as a party respondent in the paternity proceeding and an attorney for the child was assigned to represent the child, who was over seven months old when the paternity petition was filed. The mother moved to, among other things, dismiss the paternity petition based upon both the presumption of legitimacy accorded to a child born of a marriage (see Domestic Relations Law § 24 [1]) and the doctrine of equitable estoppel, and the wife also asserted those grounds in opposition to the paternity petition [FN2]. An evidentiary hearing was held on the paternity petition at which all parties, who were represented by counsel, testified, and respondents and the attorney for the child opposed the request for a paternity test. Family Court denied the motion to dismiss and ordered genetic testing. With permission of this Court, the mother appeals.[FN3]
Pursuant to Family Ct Act § 532 (a), when a paternity petition is filed, Family Court, "on the court's own motion or the motion of any party, shall order the mother, her child and the alleged father to submit to one or more genetic marker or DNA tests." However, this directive is qualified by an exception providing that "[n]o such test shall be ordered . . . upon a written [*3]finding by the court that it is not in the best interests of the child on the basis of res judicata, equitable estoppel, or the presumption of legitimacy of a child born to a married woman" (Family Ct Act § 532 [a]; see Family Ct Act § 418 [a]). Thus, where, as here, paternity is in issue, Family Court is required to order biological tests unless it relies upon the best interests of the child exception and, if so, it must "justify its refusal to order [such] tests" (Matter of Shondel J. v Mark D., 7 NY3d 320, 329 [2006]; see Matter of Suffolk County Dept. of Social Servs. v James D., 147 AD3d 1067, 1069 [2017]; Matter of Tralisa R. v Max S., 145 AD3d 727, 727-728 [2016]). Even if the presumption of legitimacy applies, the court must proceed to the best interests analysis before deciding whether to order a test (see Matter of Mario WW. v Kristin XX., 149 AD3d 1227, 1228 [2017]). To that end, the "paramount concern" in a proceeding to establish paternity is the "best interests of the child," and Family Court proceeded properly by holding a hearing addressed to that determination (Matter of Juanita A. v Kenneth Mark N., 15 NY3d 1, 5 [2010] [internal quotation marks and citation omitted]). Importantly, biology is not dispositive in a court's paternity determination (see id. at 3 ["biological father may assert an equitable estoppel defense in paternity and child support proceedings"]; Matter of Shondel J. v Mark D., 7 NY3d at 326, 330 [paternity by estoppel]; Matter of Carlos O. v Maria G., 149 AD3d 945, 946-947 [2017] [test denied although parties agreed the petitioner is the biological father]; Matter of Melissa S. v Frederick T., 8 AD3d 738, 738-739 [2004], lv dismissed 3 NY3d 688 [2004]; Matter of Richard W. v Roberta Y., 240 AD2d 812, 814 [1997] ["resolution of the estoppel issue in (the married couple's) favor would have rendered the results of (the putative father's) blood test irrelevant"], lv denied 90 NY2d 809 [1997]; see also Family Ct Act §§ 532 [a] [best interests test]; 418 [a] [same]; Domestic Relations Law § 73 [irrebuttable presumption of paternity]; Matter of Joshua AA. v Jessica BB., 132 AD3d 1107, 1108 [2015]).
Respondents argue that since the child was born to the mother while they were married, they are entitled to the presumption of legitimacy afforded to a child born to a marriage [FN4]. We agree. Domestic Relations Law § 24, entitled "Effect of marriage on legitimacy of children," expressly provides, as relevant here, that "[a] child . . . born of parents who prior or subsequent to the birth of such child shall have entered into a civil or religious marriage . . . is the legitimate child of both birth parents" (Domestic Relations Law
§ 24 [1]; see Family Ct Act § 417 [entitled "Child of ceremonial marriage"])[FN5]. Domestic Relations Law § 24 and Family Ct Act § 417 codify the common-law presumption of legitimacy [*4](see Matter of Findlay, 253 NY 1 [1930] [adopting an evidentiary presumption]; see also Michael H. v Gerald D., 491 US
110, 124-128 [1989])[FN6]. As the child was born to respondents, a married couple, they have established that the presumption of legitimacy applies, a conclusion unaffected by the gender composition of the marital couple or the use of informal artificial insemination by donor (hereinafter AID) (see Matter of Maria-Irene D. [Carlos A.—Han Ming T.], 153 AD3d 1203, 1205 [2017]; Matter of Beth R. v Ronald S., 149 AD3d 1216, 1217 [2017]; Matter of Kelly S. v Farah M., 139 AD3d 90, 100-101 [2016]; Laura WW. v Peter WW., 51 AD3d at 215-216; Wendy G-M. v Erin G-M., 45 Misc 3d 574, 593 [Sup Ct, Monroe County 2014]).[FN7]
The presumption of legitimacy is rebuttable, however, "upon clear and convincing evidence excluding the [spouse] as the child's [parent] or otherwise tending to prove that the child was not the product of the marriage" (Matter of Beth R. v Ronald S., 149 AD3d at 1217)[FN8]. [*5]In cases involving spouses of different genders, the presumption has been rebutted with proof that a husband did not have "access to" his wife at the time that she conceived a child and he acknowledged that he was not the biological father, combined with testimony that the child was conceived during a trip with the putative father with whom his wife was in a monogamous relationship (see id.; see also Matter of Jason E. v Tania G., 69 AD3d 518, 519 [2010]).
Application of existing case law involving different-gender spouses, addressing whether the presumption has been rebutted, to a child born to a same-gender married couple is inherently problematic, as it is not currently scientifically possible for same-gender couples to produce a child that is biologically "the product of the marriage" (Matter of Beth R. v Ronald S., 149 AD3d at 1217). We have recognized that this "is an evolving area of law" (Matter of Mario WW. v Kristin XX., 149 AD3d at 1228 n 1). This changing legal and social landscape requires reexamination of the traditional analysis governing the presumption of legitimacy (see e.g. Matter of Brooke S.B. v Elizabeth A.C.C., 28 NY3d at 13, 25-28)[FN9]. If the presumption of legitimacy turns primarily upon biology, as some earlier cases indicate, rather than legal status (see Matter of Paczkowski v Paczkowski, 128 AD3d 968, 969 [2015]),[FN10] it may be automatically [*6]rebutted in cases involving same-gender married parents (see e.g. id.; Matter of Q.M. v B.C., 46 Misc 3d 594, 598-599 [2014]). This result would seem to conflict with this state's "strong policy in favor of legitimacy," which has been described as "one of the strongest and most persuasive known to the law" (Laura WW. v Peter WW., 51 AD3d at 216 [internal quotation marks and citations omitted]). Summarily extinguishing the presumption of legitimacy for children born to same-gender married parents would seem to violate the dictates of the Marriage Equality Act (see L 2011, ch 95), which guarantees to such couples the same "legal status, effect, right, benefit, privilege, protection or responsibility relating to marriage" as exist for different-gender couples (Domestic Relations Law § 10-a [2]; see Matter of Kelly S. v Farah M., 139 AD3d at 97-98; but see Matter of Q.M. v B.C., 46 Misc 3d at 599 ["the Marriage Equality Act does not require the court to ignore the obvious biological differences between husbands and wives" and, "while the language of Domestic Relations Law § 10—a requires same-(gender) married couples to be treated the same as all other married couples, it does not preclude differentiation based on essential biology," decided before Matter of Brooke S.B. v Elizabeth A.C.C. (28 NY3d at 27-28)])[FN11]. As the common-law and statutory presumptions of legitimacy predate the Marriage Equality Act, they will need to be reconsidered.
While a workable rubric has not yet been developed to afford children the same protection regardless of the gender composition of their parents' marriage, and the Legislature has not addressed this dilemma, we believe that it must be true that a child born to a same-gender married couple is presumed to be their child and, further, that the presumption of parentage is not defeated solely with proof of the biological fact that, at present, a child cannot be the product of same-gender parents (see Matter of Maria-Irene D. [Carlos A.—Han Ming T.], 153 AD3d at 1205; Matter of Kelly S. v Farah M., 139 AD3d at 100-101, 104-105; see generally Matter of Brooke S.B. v Elizabeth A.C.C., 28 NY3d at 25)[FN12]. If we were to conclude otherwise, children born to same-gender couples would be denied the benefit of this presumption without a compelling justification. The difficulty is in fashioning the presumption so as to afford the same, and no greater, protections. With that said, we discern no facts in this record on which to conclude that petitioner established, by clear and convincing evidence, that the child is not entitled to the legal status as "the product of the marriage" (Matter of Beth R. v Ronald S., 149 AD3d at 1217). Thus, we find that the presumption was not rebutted. Further, even if the presumption was rebutted by the undisputed fact that petitioner was the sole sperm donor, we find, for reasons to be explained, that the doctrine of equitable estoppel applies to the circumstances here and that it is not in the child's best interests to grant petitioner's request for a paternity test.
Before addressing the issue of equitable estoppel, we note that petitioner's reliance on the parties' noncompliance with Domestic Relations Law § 73 is unavailing. That statutory provision creates an irrebuttable presumption of parentage for a married couple who utilizes formal AID performed by medical personnel and meets certain conditions. Domestic Relations Law § 73 states:
"Any child born to a married woman by means of artificial insemination performed by persons duly authorized to practice medicine and with the consent in writing of the woman and her [spouse], shall be deemed the legitimate, birth child of the [spouse] and his [or her] wife for all purposes. The aforesaid written consent shall be executed and acknowledged by both the [spouse] and wife and the physician who performs the technique shall certify that he [or she] had rendered the service" (Domestic Relations Law § 73 [1], [2]).
We have noted that this statute only "covers one specific situation" by "provid[ing] a mechanism for married couples who utilize AID to have a child with assurances that the child will be, for all purposes, considered the legitimate child of both the [impregnated] woman and her [spouse]" (Laura WW. v Peter WW., 51 AD3d at 214-215). We expressly recognized that this is not the "exclusive means" for a nonbiological parent/spouse to establish parentage of a child born through AID procedures to a married woman (id.; see Matter of Kelly S. v Farah M., 139 AD3d at 102). While respondents admittedly cannot benefit from this statutory protection, which they attributed to the prohibitive costs associated with such services and the lack of health insurance coverage for a medical AID procedure, this only leads to the conclusion that this statute does not establish the wife's rights; it does not mean that the wife's rights as a spouse to the mother cannot otherwise be established (see Laura WW. v Peter WW., 51 AD3d at 214). Indeed, we have recognized that, prior to the enactment of Domestic Relations Law § 73, the common-law rule was that "a child born of consensual AID during a valid marriage is a legitimate child entitled to the rights and privileges of a naturally conceived child of the same marriage" (id. at 216 [internal quotation marks and citation omitted]). The child here is entitled to that status regardless of the gender of her parents.
We further agree with respondents that it is appropriate to apply the doctrine of equitable estoppel to preclude petitioner from asserting paternity. Generally stated, the essential
"purpose of equitable estoppel is to preclude a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted. The law imposes the doctrine as a matter of fairness. Its purpose is to prevent someone from enforcing rights that would work injustice on the person against whom enforcement is sought and who, while justifiably relying on the opposing party's actions, has been misled into a detrimental change of position" (Matter of Shondel J. v Mark K., 7 NY3d at 326 [emphasis added]; see Matter of Carlos O. v Maria G., 149 AD3d at 946; Matter of Stephen N. v Amanda O., 140 AD3d 1223, 1224 [2016]; Matter of Richard W. v Roberta Y., 240 AD2d at 814).
As relevant here, the doctrine "is a defense in a paternity proceeding which, among other [*7]applications, precludes a man from asserting his paternity when he acquiesced in the establishment of a strong parent-child bond between the child and another [person]" (Matter of John J. v Kayla I., 137 AD3d 1500, 1501 [2016] [internal quotation marks, ellipsis and citations omitted]; see Matter of Stephen N. v Amanda O., 140 AD3d at 1224; see also Family Ct Act § 522). It is significant that "courts impose equitable estoppel to protect the status interests of a child in an already recognized and operative parent-child relationship" (Matter of Shondel J. v Mark D., 7 NY3d at 327 [internal quotation marks and citation omitted]; see Matter of Suffolk County Dept. of Social Servs. v James D., 147 AD3d at 1069; see also Matter of Baby Boy C., 84 NY2d 91, 102 n [1994]). While this doctrine is invoked in a variety of situations, "whether it is being used in the offensive posture to enforce rights or the defensive posture to prevent rights from being enforced, [it] is only to be used to protect the best interests of the child" (Matter of Juanita A. v Kenneth Mark N., 15 NY3d at 6; see Matter of Suffolk County Dept. of Social Servs. v James D., 147 AD3d at 1069; Matter of Tralisa R. v Max S., 145 AD3d at 728). For that reason, this dispute "does not involve the equities between [or among] the . . . adults; the case turns exclusively on the best interests of the child" (Matter of Shondel J. v Mark D., 7 NY3d at 330; accord Matter of Carlos O. v Maria G., 149 AD3d at 946).
The parties asserting equitable estoppel — the mother and the wife — have "the initial burden of establishing a prima facie case sufficient to support that claim" and, "[a]ssuming that burden is met, the burden then shifts to the nonmoving party — here, petitioner — to establish that it would be in the best interests of the child[] to order the genetic marker test" (Matter of Patrick A. v Rochelle B., 135 AD3d 1025, 1026 [2016] [internal quotation marks and citation omitted], lv dismissed 27 NY3d 957 [2016]; see Matter of Starla D. v Jeremy E., 95 AD3d 1605, 1606 [2012], lv dismissed 19 NY3d 1015 [2012]). We find that respondents satisfied their initial burden to support invoking this doctrine, and that petitioner failed to satisfy his corresponding burden of establishing that it would be in the child's best interests to order the test. The credible testimony established that, at the time that petitioner voluntarily donated his sperm to respondents, he had engaged in several discussions with them and his partner about donating sperm to enable respondents to have a child together. He unequivocally understood that he was doing so to permit the mother and the wife to be the sole parents of any child conceived, aware that they wanted to raise the child together and planned to marry, as they did prior to the birth of the child. Most significantly, petitioner had no expectation of parentage in any form; indeed, he had expressly disavowed any such parental intention, rights or responsibilities and took steps to preclude respondents from later pursuing him for paternity or child support.
Petitioner's conduct was likewise consistent with that agreement. He was not involved in the child's prenatal care or present at her birth, did not know her birth date, never attended doctor appointments and did not see her for at least one or two months after her birth. He was employed, but never paid child support, and provided no financial support aside from a single cash Christmas gift intended for all of the children in respondents' home and one or two outfits of clothing for the child. By his own admission, he donated sperm as a "humanitarian[]" gesture, to give respondents "the gift of life" and expected only "contact" with the child as a "godparent" by providing her mothers with "a break" or "help." He never signed an acknowledgment of paternity or asked to do so (see Family Ct Act § 516-a), and no aspect of his testimony or conduct supports the conclusion that he donated sperm with the expectation that he would have a parental role of any kind in the child's life, and he never had or attempted to assert such a role (compare Matter of Leon L. v Carole H., 210 AD2d 484, 485 [1994]).
By contrast, it was uncontroverted that, like the mother, the wife was in a "recognized and operative parent-child relationship" with the child and had "assum[ed] actual physical and psychological burdens attendant to parenting a newborn" (Matter of John J. v Kayla I., 137 AD3d [*8]at 1501-1502 [internal quotation marks and citation omitted]; see Matter of Carlos O. v Maria G., 149 AD3d at 946-947; Matter of Felix O. v Janette M., 89 AD3d 1089, 1090 [2011]; compare Matter of Beth R. v Ronald S., 149 AD3d at 1218; Matter of John J. v Kayla J., 137 AD3d at 1501-1502). The wife was present at the child's birth, gave the child her surname, is recorded as a mother on the child's birth certificate and was listed as a parent for purposes of government benefits. There was no dispute that the wife "played a significant role in raising, nurturing [and] caring for the child" and, to that end, "provided food, clothing and shelter for the child for most of her life" and "otherwise carried out all the traditional responsibilities of a [parent]" (Matter of Starla D. v Jeremy E., 95 AD3d at 1607 [internal quotation marks, brackets and citations omitted]; see Matter of Carlos O. v Maria G., 149 AD3d at 946; Matter of Richard W. v Roberta Y., 240 AD2d at 814; compare Matter of Gutierrez v Gutierrez-Delgado, 33 AD3d 1133, 1135 [2006])[FN13]. As Family Court expressly found and the record unequivocally establishes, it was respondents who "provided all of the parenting, emotional and financial support for the child" (compare Matter of Patrick A. v Rochelle B., 135 AD3d at 1026; Matter of Starla D. v Jeremy E., 95 AD3d at 1606-1607; Matter of Richard W. v Roberta Y., 240 AD2d at 814).
Consequently, the only conclusion that may be reached from the testimony is that petitioner — aware during the mother's entire pregnancy and for over seven months thereafter that he was the probable biological father — "acquiesced in the establishment of a strong parent-child bond between the child and [the wife]" for a protracted period of time (Matter of John J. v Kayla I., 137 AD3d at 1501 [internal quotation marks and citation omitted]; see Matter of Richard W. v Roberta Y., 240 AD2d at 814). At the time that he filed this paternity petition, the child, then over seven months old, was "in an already recognized and operative parent-child relationship" (Matter of Shondel J. v Mark D., 7 NY3d at 327 [internal quotation marks and citation omitted]; see Matter of Carlos O. v Maria G., 149 AD3d at 946-947; compare Matter of Beth R. v Ronald S., 149 AD3d at 1218-1219; Matter of Patrick A. v Rochelle B., 135 AD3d at 1026; Matter of Starla D. v Jeremy E., 95 AD3d at 1606-1607; Matter of Isaiah A. C. v Faith T., 43 AD3d 1048, 1049 [2007]). Having led respondents to reasonably believe that he would not assert — and had no interest in acquiring — any parental rights and was knowingly and voluntarily donating sperm to enable them to parent the child together and exclusively, representations on which respondents justifiably relied in impregnating the mother, it would represent an injustice to the child and her family to permit him to much later change his mind and assert parental rights (see Matter of [*9]Shondel J. v Mark K., 7 NY3d at 326; Matter of Richard W. v Roberta Y., 240 AD2d at 814; compare Matter of Beth R. v Ronald D., 149 AD3d at 1218-1219).[FN14]
Significantly, invocation of the doctrine of equitable estoppel is warranted here "to protect the status interests of [the] child," who was born to married parents and thereafter lived with them in a family unit (Matter of John J. v Kayla I., 137 AD3d at 1501 [internal quotation marks and citation omitted]; see Obergefell v Hodges, 135 S Ct at 2600-2601; Matter of Carlos O. v Maria G., 149 AD3d at 946-947). While the child, now over three years old, was an infant when the paternity proceeding was commenced, we nonetheless find that petitioner's representations in donating sperm combined with his delay in asserting parental rights compel against ordering a test. While young, the child's "image of her family" — consisting of two mothers — would be devastated by an outsider, who merely donated sperm, belatedly asserting parental rights (Matter of Edward WW. v Diana XX., 79 AD3d 1181, 1183 [2010] [internal quotation marks and citation omitted]; compare Matter of John J. v Kayla I., 137 AD3d at 1502; Matter of Starla D. v Jeremy E., 95 AD3d at 1607).
To overcome respondents' prima facie showing, petitioner was required to establish that it would be in the child's best interests to order the tests [FN15]. This he failed to do. The analysis traditionally requires consideration of numerous factors, including "the child's interest in knowing the identity of his or her biological father, whether testing may have a traumatic effect on the child, and whether continued uncertainty may have a negative impact on a parent-child relationship in the absence of testing" (Matter of Mario WW. v Kristin XX., 149 AD3d at 1228; see Matter of Beth R. v Ronald S., 149 AD3d at 1218-1219; Matter of Gutierrez v Gutierrez-[*10]Delgado, 33 AD3d at 1134; Matter of Anthony M., 271 AD2d 709, 711 [2000]). Consideration is given to whether the child "would suffer irreparable loss of status, destruction of [her] family image, or other harm to [her] physical or emotional well-being if this proceeding were permitted to go forward" (Matter of Starla D. v Jeremy E., 95 AD3d at 1607 [internal quotation marks and citation omitted]). Also relevant are the wife's relationship with the child, trauma to the child attributable to identifying a third person as a parent and the very real disruption to the "stability of the child's existing family" that would result (Matter of Mario WW. v Kristin XX., 149 AD3d at 1229; see Obergefell v Hodges, 135 S Ct at 2600-2601; Matter of Ettore I. v Angela D., 127 AD2d at 14-15).
Application of the best interest factors fails to support Family Court's decision to order genetic testing. The testimony at the hearing established that the child had a bonded relationship with both parents, and the fact that they are both mothers does not warrant a finding that the child has an interest in knowing the identity of, or having a legal or familial relationship with, the man who donated sperm that enabled the mother's conception. "To permit petitioner to take over the parental role at this juncture would be unjust and inequitable" (Matter of Richard W. v Roberta Y., 240 AD2d at 814 [citation omitted]). Contrary to Family Court's apparent conclusion, granting the request of a sperm donor for a paternity test would effectively disrupt, if not destroy, this family unit and nullify the child's established relationship with the wife, her other mother. Testing in these circumstances exposes children born into same-gender marriages to instability for no justifiable reason other than to provide a father-figure for children who already have two parents. This would be indefensible, and not warranted by the facts adduced at the hearing. Further, it would undermine the "compelling public policy of protecting children conceived via AID" (Laura WW. v Peter WW., 51 AD3d at 217). While Family Court recognized that testing would be harmful to respondents' marital relationship and to the wife's maternal relationship with the child, and then disregarded that finding, the record does not support doing so. Moreover, we find that the harm to the child's mothers and to the child's relationships with her family cannot be separated from the analysis of the child's best interests. That is, the relational damage within the child's family is relevant to, and supports, our finding that testing is not in the child's best interests (see Obergefell v Hodges, 135 S Ct at 2600-2601).
Finally, a new attorney for the child was appointed to represent the child on appeal who, contrary to the position taken by the attorney for the child in Family Court, advocated in favor of petitioner's request for genetic testing, based on events that occurred subsequent to the 2015 hearing and Family Court's determination. At oral argument, this Court was advised that the child has been in foster care for a lengthy period of time since the hearing and that there are reportedly neglect petitions pending against respondents, the details of which were not known to any of the parties' counsel (compare Matter of John J. v Kayla J., 137 AD3d at 1502). These developments are certainly relevant, concerning and appropriately considered. However, we find that the subsequent events, on which we take no position, do not alter our conclusion that respondents established at the hearing that petitioner should be equitably estopped from asserting paternity under the circumstances known to Family Court at the time of the hearing (compare Matter of Anthony M., 271 AD2d at 709-711). Allowing ongoing, successive consideration of subsequent developments and problems within the child's family after respondents had already established, at the hearing, that petitioner should be estopped from asserting paternity, should not be permitted. Doing so would continue to invite challenges to the then-established family unit into which the child was born, creating instability and uncertainty.
Egan Jr., J.P., Devine, Clark and Rumsey, JJ., concur.
ORDERED that the amended order is reversed, on the law and the facts, without costs, and motion to dismiss the paternity petition granted.



Footnotes

Footnote 1: While petitioner denied that there was such a written agreement, and partially disputed respondents' account of the parties' understanding as to the extent of his expected involvement in the life of any child conceived, Family Court credited the contrary testimony of respondents and petitioner's partner. We defer to those credibility determinations, which are fully supported by a sound and substantial basis in the record (see Matter of Catherine A. v Susan A., 155 AD3d 1360, 1361 [2017]).

Footnote 2: While the wife did not formally move to dismiss the paternity petition, or expressly join the mother's motion to dismiss prior to the hearing, respondents and the attorney for the child all moved to dismiss the petition at the close of petitioner's case. Family Court denied that motion.

Footnote 3: This Court granted a stay pending appeal.

Footnote 4: Family Court's jurisdiction to address the contested paternity of a child born to a married woman has been recognized (see Matter of Nathan O. v Jennifer P., 88 AD3d 1125, 1126 [2011], appeal dismissed and lv denied 18 NY3d 904 [2012]).

Footnote 5: As a noted commentator observed, "The [Family Ct Act § ] 417 presumption of legitimacy applies to married 'parents.' Hence it should apply to same[-]sex as well as heterosexual married couples; a child born to a same[-]sex couple who married at any time prior or subsequent to the child's birth is presumptively deemed to be legitimate. The problem . . . is that the presumption is evidentiary and is hence rebuttable. When appropriate, equitable estoppel may be applied to defeat an attempted rebuttal, but estoppel is always an uncertain doctrine" (Merril Sobie, 2014 Supp Practice Commentaries, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 417, 2017 Cum Pocket Part at 100).

Footnote 6: A noted commentator questioned the relevance of the presumption of legitimacy, given the modern availability of genetic and DNA testing that can conclusively establish paternity, and suggested that it has been effectively replaced by principles of equitable estoppel (see Merril Sobie, Practice Commentaries, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 417 at 285-286; see also Family Ct Act §§ 532 [a]; 418 [a]; Merril Sobie, Practice Commentaries, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 418 at 292).

Footnote 7: Indeed, it has been recognized that "a child born to a married person by means of artificial insemination with the consent of the other spouse is deemed to be the child of both spouses, regardless of the couple's sexual orientation" (Matter of Brooke S.B. v Elizabeth A.C.C., 28 NY3d 1, 32 [2016, Pigott, J., concurring]; see Laura WW. v Peter WW., 51 AD3d at 213-214).

Footnote 8: Respondents did not raise an equal protection or other constitutional challenge to the presumption of legitimacy or the manner in which it may be rebutted in the context of a child born to a married, same-gender couple. We recognize that the concept of "legitimacy" — which concerns the effect of a marriage on a child's legal and social status, particularly inheritance rights and child support obligations — has historically focused on fatherhood/paternity, and the stigma and burdens of illegitimacy, and is somewhat archaic (see Matter of Fay, 44 NY2d 137, 141-142 [1978], appeal dismissed 439 US 1059 [1979]; Matter of Findlay, 253 NY at 7-8). However, in recognition of the fundamental right of all persons to marry (see Obergefell v Hodges, ___ US ___, ___, 135 S Ct 2584, 2604-2605 [2015]; Domestic Relations Law § 10-a [2]; L 2011, ch 95, § 2) and the need to afford comparable protections and rights to same-gender spouses, the presumption may, more accurately, be viewed in modern times as a presumption of parentage as to both the biological parent and his or her spouse, whether male or female (see e.g. Matter of Maria-Irene D. [Carlos A.—Han Ming T.], 153 AD3d at 1205). The applicability of the presumption of parentage to same-gender married couples is arguably compelled by the Marriage Equality Act (see L 2011, ch 95), which provides, in part, that "[n]o government treatment or legal status, effect, right, benefit, privilege, protection or responsibility relating to marriage, whether deriving from statute, administrative or court rule, public policy, common law or any other source of law, shall differ based on the parties to the marriage being or having been of the same sex rather than a different sex" (Domestic Relations Law § 10-a [2] [emphases added]). In adopting this Act, the Legislature declared its unambiguous intent that "[s]ame-sex couples should have the same access as others to the protections, responsibilities, rights, obligations and benefits of civil marriage" and that "marriages of same-sex and different-sex couples be treated equally in all respects under the law" (L 2011, ch 95, § 2 [emphasis added]). The Legislature has not clarified how the presumption of legitimacy is to be employed or rebutted in the context of either same-gender marriages or informal AID.

Footnote 9: A noted commentator has opined that "since the presumption of legitimacy is evidentiary and hence rebuttable, it may be of no value to a same[-]sex couple (at least unless the child was conceived via [AID] in accordance with Domestic Relations Law [§ ] 73)" (Merril Sobie, 2015 Supp Practice Commentaries, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 417, 2017 Cum Pocket Part at 100).

Footnote 10: Notably, Matter of Paczkowski v Paczkowski (supra) relied upon Debra H. v Janice R. (14 NY3d 576 [2010]), which was later abrogated by Matter of Brooke S.B. v Elizabeth A.C.C., (28 NY3d at 27-28), which held that the nonadoptive partner of a child's birth mother had standing to seek visitation and custody of a child where the couple had agreed to conceive and raise the child together.

Footnote 11: One trial court concluded, to the contrary, that because the statutory presumptions of legitimacy predate both the Marriage Equality Act and the increasing availability of artificial insemination, they "only have applicability in opposite-sex marriages as evidenced by the fact that the usual technique to confirm parentage is a genetic test of the putative father which establishes an irrefutable genetic link between the child and the father" (Wendy G-M. v Erin G-M., 45 Misc 3d at 578).

Footnote 12: It is unclear whether Family Court concluded that the presumption was rebutted here. To the extent that the court may have concluded that it was rebutted based solely on the fact that the child's parents are of the same gender, we cannot agree.

Footnote 13: As this Court explained in a case involving a putative father seeking a paternity test with respect to a child born to a married woman and her husband in which we determined that equitable estoppel precluded the test, "we have considered all of the actions [the husband] took, both before and after the birth . . . in reliance upon his belief that he was the child's father. Thus, in addition to [his] assumption of the actual physical and psychological burdens attendant to parenting a newborn, and the extent of the parent-child relationship that he forged with the baby after she was born, it is necessary to take into account the time, energy and money he expended to prepare for her arrival, his participation in decision making with regard to her upbringing and, not insignificantly, the fact that he married [his wife, the child's mother,] earlier than he had otherwise planned so as to legitimize the child" (Matter of Richard W. v Roberta Y., 240 AD2d at 814). This analysis applies equally to the facts sub judice.

Footnote 14: By parity of reasoning, if the posture of the paternity proceeding were altered, and the mother were seeking a test to establish petitioner's paternity in order to obtain child support from him or to preclude the wife's exercise of parental rights, the presumption would apply and the same conclusion regarding equitable estoppel should obtain (see Matter of Juanita A. v Kenneth Mark N., 15 NY3d at 6; Matter of Sharon GG. v Duane HH., 95 AD2d 466, 467-468 [1983], affd 63 NY2d 859 [1984]; see also Matter of Brooke S.B.v Elizabeth A.C.C., 28 NY3d at 28; Matter of Kelly S. v Farah M., 139 AD3d at 104-105; Matter of Ettore I. v Angela D., 127 AD2d 6, 14 [1987] ["It would be incongruous, illogical and unrealistic to conclude that a child would be any less devastated by being forced to accept a stranger as her father merely because the stranger initiated the legal proceeding"]). Likewise, if the wife, having consented to AID, were seeking a test to relieve her of parental rights and obligations, the doctrine of equitable estoppel may well be invoked to protect the child and her operative parental relationship with the wife (see e.g. Hammack v Hammack, 291 AD2d 718, 720 [2002]; see also Laura WW. v Peter WW., 51 AD3d at 216-218).

Footnote 15: Although Family Court's decision did not clearly make a best interests determination, the record is sufficient to permit this Court doing so (compare Matter of Mario WW. v Kristin XX., 149 AD3d at 1228).